## In Equity.

## JOSEPH C. BROWN *vs.* AMOS F. GERALD et al.

## Kennebec.    Opinion June 29, 1905.

*Corporations.    Charter.    Construction.    Eminent. Domain.    Power.    Public*
*Exigency.    Public Use.    "Plant."    Supply of Electricity.    Quasi Public*
*Corporation.    Const. Mass., Chapter 1, Sect. 1, Art. IV.    Const. of*
*Maine, Art. 1, Sect. 1.    Special Laws of 1899, c. 86.*
*Special Laws 1903, c. 271.*

Under its charter, a corporation was empowered to manufacture, generate, sell, distribute and supply electricity for lighting, heating, traction, manufacturing or mechanical purposes, in Benton and Albion, or for any or either of such purposes. It was authorized to build and maintain a dam or dams on the Sebasticook river in Benton; also to take, as for public uses, any water rights or land, and to flow any lands or other privileges, for the purpose of constructing and maintaining its dams, and the establishment of its plant, but not to flow any mill privilege upon which a dam was then built without the consent of the owners thereof. It was also empowered specifically to transmit electric power within said towns, for lease or sale, "in such manner as may be expedient," and subject to the general laws, to erect poles and wires for that purpose. The towns and the corporations were authorized to make contracts for public lighting. Prior to the bringing of this bill, the corporation had constructed a dam, erected a station, and was installing an electrical plant, to be connected with the water wheels. It had contracted to deliver to a manufacturing corporation in Winslow the entire electrical current or energy developed by water power on the dam for a period of ten years. The current was to be delivered by the electric company at a point in Benton near the Winslow line, where the other party was to take it and transmit it by lines of its own to. its own mills in Winslow for use as power in manufacturing pulp and paper. By a supplemental agreement, the right was reserved by the electric company to take from the wires so much electricity as might be required to enable it to perform its duties as an electric light company. The proposed line of poles and wires from the electric station to the point of delivery of the current at the Winslow line was nearly six miles long. It did not follow the roads, but crossed twenty-four farms, including the plaintiff's. The company under its charter had by regular proceedings, taken a strip of the plaintiff's land for the purpose of erecting thereon its line of poles and wires. On a bill brought to enjoin the company and its agents and servants from erecting such poles and wires on plaintiff's land so taken, it is *held :*

1. That the word "plant" in defendant's charter includes its pole and wire lines.

2. Assuming that the land was in form taken for all of the chartered purposes of the corporation, and that some of those purposes justified the exercise of the right of eminent domain, it does not necessarily follow that this taking can be sustained.

3. When the legislature grants the right of eminent domain for several purposes, for some of which the grant would be constitutional, and for others not, with the discretion in the grantee to exercise the right when and where it chooses, within the confines of a large territory, that discretion must be used in good faith, and the taking must actually be for the constitutional purpose in order to be valid. And the actual purpose is open to judicial inquiry.

4. Under the circumstances of this case, whatever may have been the purposes of the corporation elsewhere, the court finds that the land of the plaintiff was actually taken for the transmission of an electric current generated by the defendant corporation, and sold by it to another, for manufacturing or power purposes, and not for electric lighting or other purposes.

5. The private property of one cannot constitutionally be taken by another under the sanction of legislative authority, without the consent of the owner, except for public uses, and then only in case of public exigency.

6. Whether a public exigency exists for the granting of the exercise of the right of eminent domain, is for the legislature to determine. Whether the use for which it is granted is a public one, the court must decide.

7. A public use such as justifies the taking of private property against the will of the owner cannot rest merely upon public benefit or public interest, or great public utility. It implies a possession, occupation and enjoyment of the property taken by the public at large, or by public agencies. That only can be considered a public use where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience or welfare which, on account of their peculiar character and the difficulty or impossibility of making provisions for them otherwise, it is alike proper, useful and needful for the government to provide.

8. Manufacturing, generating, selling, distributing and supplying electricity for power, for manufacturing or mechanical purposes, is not a public use for which private property may be taken against the will of the owner.

9. A corporation empowered by its charter to generate and transmit electric power, for lease or sale, and having granted to it the right of eminent domain, does not by accepting the provisions of its charter become a quasi public corporation, and does not thereby become invested with the right to exercise the eminent domain for the purpose of supplying electric power for manufacturing purposes.

10. If a corporation is not a quasi public one, it cannot make itself one by a vote recognizing itself as such, and pledging itself to perform the duties of a quasi public corporation.

In Equity. On report. Bill sustained. Perpetual injunction to issue.

Bill in equity praying for an injunction to restrain the defendants from erecting a line of poles and wires across the plaintiff's farm in Benton, Kennebec County. When this cause came on to be heard before the Justice of the first instance upon a motion for a temporary injunction, the parties agreed that the answer and replication should be waived and that the testimony and admissions should stand as if taken upon a hearing for a final decree, and that the cause be reported to the Law Court and that "upon so much of the testimony as is legally admissible the Law Court shall render such judgment as the law and equity requires."

The facts, so far as material, are fully stated in the opinion.

*Brown & Brown,* for plaintiff.

*Heath & Andrews,* for defendants.

SITTING: WISWELL, C. J., EMERY, STROUT, SAVAGE, POWERS, SPEAR, JJ.

SAVAGE, J. Bill in equity praying for an injunction to restrain the defendants from erecting a line of poles and wires across the plaintiff's farm in Benton. The case comes up on report. The defendants admit an intention to erect the line of poles and wires, but claim they have a right to do so under the charter of the Sebasticook Manufacturing and Power Company, one of the defendants, of which Mr. Gerald, the other defendant, is the president and general manager. It is therefore necessary to examine the charter of the defendant corporation, chap. 86, Private and Special Laws of 1899, as amended by chap. 271 of the Private and Special Laws of 1903, in order to ascertain its powers. Some question having been raised in regard to the proper construction of this charter, we will state, without much discussion, the construction we place upon so much of it as is involved in the consideration of the case before us. And this we do, at present, without any reference to the constitutionality of any of its provisions.

VOL. C 23

By the original charter the company was empowered to manufacture, generate, sell, distribute and supply electricity for lighting, heating, traction, manufacturing or mechanical purposes in the towns of Clinton, Benton and Albion, or for any or either of such purposes. The company therefore might generate, sell, distribute and supply electricity to others for electric lighting, or electric heating, or traction power for an electric railway, or for electric power for manufacturing or mechanical purposes, or for all of these purposes. But it is conceded that it could not use the electricity for these purposes on its own account. For instance, to suit the illustration to this case, it could not itself engage in manufacturing by electric power. It might sell such power to others. By the amendment of 1903, the right to manufacture, etc., electricity for lighting purposes in the town of Clinton was withdrawn. To accomplish its chartered purposes, it was authorized to build and maintain a dam or dams on the Sebasticook River, in the town of Benton. By the original act the company was also authorized to take as for public uses, that is, by the exercise of the right of eminent domain, any water rights or land, and to flow any lands or other privileges, for the purpose of constructing and maintaining its dams, and the establishment of its plant, which includes, we think, its pole and wire lines. But by the amendment it was provided that it should have "no right to flow any mill privilege upon which a dam is now built without the consent of the owners thereof." The company therefore might take land for the erection of its lines of poles and wires. Certain street rights in Benton were given by the charter, by which poles could be set and wires extended for the purpose of electric lighting, in the towns named, subject to the permission of the municipal officers, and subject to the general laws regulating the erection of poles and wires for electrical purposes. And the company was also empowered specifically to transmit electric power within said towns, for lease or sale, "in such manner as may be expedient," and, subject to the general laws, to erect poles and wires for that purpose. The towns and the corporation were authorized to make contracts for public lighting.

Prior to the bringing of this bill, the company had constructed a

dam on the Sebasticook River in Benton, capable of developing 1258 horse power of water power. It had erected a station and was installing an electrical plant, to be connected with the water wheels. It had contracted to deliver to the Hollingsworth & Whitney Co., of Winslow, the entire electrical current or energy developed by water power on the dam, for a period of ten years. The electrical current was agreed to be delivered at a point in Benton, near the Winslow line, where the Hollingsworth & Whitney Co. was to take it and transmit it by lines of its own to its mill in Winslow for use as power in manufacturing pulp and paper. By a supplemental agreement made after this controversy arose, the defendant company reserved the right to take from the wires so much electricity as might be required to enable it to perform its duties as an electric light company. To transmit the current from the station to the point of delivery at or near the Winslow line required a line of poles and wires nearly six miles long. This had nearly all been erected. The line was practically straight. It did not follow the roads in any place, but crossed twenty-four farms, including the plaintiff's. It did not pass in proximity to many buildings. The testimony of the defendant Gerald shows clearly that there is now no demand for public or municipal lighting in Benton, that there are no large villages which require lighting, that one man, and one only, had agreed to take domestic lights, though he (Gerald) had talked frequently with people about it, and that between plaintiff's farm and the end of the line, about two miles, with the exception of the last house in Benton, there is no call for lights whatever. Mr. Gerald said that he did "not know of a thing from the power station to the end of the line that would call for power." Being asked about the development of electricity for people that live along the line, he answered, "I don't know anyone that lives along the line that wants it." Of course these things are quite collateral in some aspects of the case, as will appear when we discuss what constitutes a public use. But in other aspects they seem to us to be material and important, as we shall attempt to show presently.

It is contended that the defendant company, under its charter, has the power to exercise constitutionally the right of eminent domain for

each of its four chartered purposes, — furnishing an electrical current for lighting, for heating, for traction, and for power for manufacturing or mechanical uses. But it makes the point, that if for any reason this power cannot be exercised within constitutional limits, for all of these purposes, it can certainly be used, so far as electric lighting is concerned, and perhaps for other uses, and therefore that if the company had the right of eminent domain for lighting purposes, and exercised it in this instance for those purposes among others, the taking would be valid, even if it could not be sustained, were it dependent upon power purposes alone. It says it had a right to take the plaintiff's land and erect pole lines upon it for the purpose of furnishing an electric current for lights, and that that affords a complete justification, whether it could exercise the eminent domain for supplying power for manufacturing or not. *Cole* v. *County Commissioners,* 78 Maine, 532. It says, and justly in this aspect, that it is for the legislature, and not the court, to say whether there is any such demand or exigency in that locality for electric lights as to justify the exercise of the right of eminent domain.

We assume in this case that the taking of the defendants was in form, for all of its chartered purposes. We also assume, but do not decide, that, under the authority of *Cole* v. *County Commissioners,* supra, a taking may be sustained, even if some of the uses are extra-constitutional, that the bad may be rejected, and the good may stand. Some courts have held to the contrary. *Gaylord* v. *Sanitary Dist.,* 204 Ill. 576; *Atty. Gen.* v. *Eau Claire,* 37 Wis. 400. But see 15 Cyc. 579. We think it should be conceded that the taking of land for the purpose of supplying the public, or so much of the public as wishes it, with electric lighting, is for a public use. But even so, it does not necessarily follow that this taking can be sustained as a taking for that purpose. The charter unquestionably gives the company the right of eminent domain for the purpose of supplying a current for electric lighting. It places no limitations or restrictions upon the exercise of this right. The company may go when and where it chooses. It may take whose land it chooses. It may use its discretion as to these things. But if the company seeks to justify on the ground that the taking was for lighting purposes, it must

appear that it exercised the right actually for lighting purposes. If it did so, it might also use the property thus obtained for other incidental purposes, as has many times been held. See *Atty. Gen.* v. *Eau Claire*, 37 Wis. 400. But to support the taking under the lighting feature of the charter, it is necessary that it should actually have been made for that purpose. If the legislature had authorized the taking of this particular land for lighting purposes, and nothing else, it would probably have been a conclusive determination of the use for which it is intended to be taken. But when the legislature grants the right of eminent domain for several purposes, for some of which the grant would be constitutional, and for others not, with the discretion in the grantee to exercise the right when and where it chooses, within the confines of a large territory, we think it must use that discretion in good faith, and the taking must actually be for the constitutional purpose in order to be valid. And we think further that the actual purpose is open to judicial inquiry. Randolph on Eminent Domain, 47. Suppose a company were chartered to do an electric light and a banking business, and had given to it generally the right of eminent domain. Could it condemn a lot for a banking house, under guise of its right to condemn for lighting purposes? And if it should in terms condemn land for lighting purposes, when the real and only purpose was to secure a lot for a banking house, would the public, or the owner of the land taken, be concluded? We think not. And if it did, under its general powers, condemn land for lighting purposes, and use it solely for a banking house, would not the presumption be strong that it was not actually condemned for lighting purposes. Certainly it would. The condemnation proceedings afford, of course, prima facie evidence of the purposes of the taking, but we think this ought not to be, and is not, conclusive. "The existence of the power to take private property for public use by right of eminent domain excludes the idea that it may be taken for private use, or under semblance of a public use and immediately or ultimately be converted and appropriated to private uses." *Dunham* v. *Williams*, 36 Barb. 136. "In determining the question of public use, courts are not confined to, and it is not to be tested exclusively by, the description of those objects and purposes as are set forth in the

articles of association, but evidence aliunde, showing the actual business proposed to be conducted, may be considered." In re *Niagara Falls Ry. Co.*, 108 N. Y. 375. And we think it equally so when a company attempts to exercise the right of eminent domain for several purposes, some of which are for public uses and some not. The law seeks the truth. It finds it sometimes under many disguises. It is particularly necessary to administer it in a proceeding by which one person seeks to obtain the property of another by eminent domain, which has often been said to be in derogation of common right. *Chi. & East. Ill. R. R. Co.* v. *Wiltse*, 116 Ill. 449; *Bangor & Piscataquis R. R. Co.* v. *McComb*, 60 Maine, 290; 15 Cyc. 567. It is not necessary to say, and it may not be true, that the provision in this charter for supplying currents for electric lighting were purely colorable and were never intended to be used. In re *Eureka Basin Warehouse & Mfg. Co.*, 96 N. Y. 42. But in view of the surrounding situation, in the sparsely settled town of Benton, in view of the absence of any call for electric lighting in that town, and of the large expense of installing an electric plant, if the promoters had any real intention of doing anything towards electric lighting in the lifetime of their charter, their hopes were highly illusionary.

But when we come to consider this particular case, we cannot doubt. We start with a dam and station erected, and electrical apparatus installed, all at a cost of $80,000, with one electric light customer for twelve lights secured, with one at the Winslow end of the line who "suggests" that he may take lights, with no other takers of light, actual or prospective, between plaintiff's land and the Winslow line, two miles, with no knowledge otherwise of anyone along the line who wants or will take light or power, but on the other hand with a contract to deliver the entire electrical power product of the dam to a manufacturing company for its own purposes for ten years, at a gross rental of about $20,000 a year. Under these conditions the company starts to locate its line of poles and wires. Metaphorically speaking, and practically so, in fact, it goes straight as an arrow to the point of delivery to the manufacturing company. When it reaches the plaintiff's land, it has seemingly gone beyond the area of possible electric lighting. Whatever

reasons there may have been for taking other lands before that, we must now inquire for what was the intended taking of the plaintiff's land ? Can a reasonable man doubt? We think not. Everything in the case shows that the plaintiff's land was being taken to enable the company to deliver electrical power to the Hollingsworth & Whitney Company, according to contract. A purpose to use the line for electric lighting was wanting. It is not discoverable. "The use of a franchise granted for public purposes as a mere cover for a private enterprise is contrary to public policy," said the court in *Fanning* v. *Osborne*, 102 N. Y. 441.

It is, however, suggested that this conclusion of fact ought not to be reached, because the company should not be judged by its beginnings, and because it is ready to furnish electricity for lighting to all along the line who wish it, and are desirous of using it, and that the future may develop a call for lighting. We do not think this is a sufficient answer in this case. We are satisfied from the whole case, that the company, however willing it might be, did not expect or contemplate transmitting a current for electric lighting along the line on land taken from the plaintiff. The possibility of such a use for the public is too remote for consideration. We think it must be held that the land of the plaintiff was actually and primarily taken for the purposes of the Hollingsworth & Whitney Co. contract.

We are therefore brought to inquire whether a taking for that purpose can be sustained. In other words, can lands be taken by the eminent domain for a line of poles and wires on which is to be transmitted an electric current for manufacturing or power purposes? The charter of the defendant company confers authority as broad as that, if it can be held to be constitutional. It should be borne in mind that the defendant corporation has no authority by its charter to use the electric current generated by it for manufacturing purposes on its own account. It does not propose to do so. It merely intends to generate and sell an electric current, and it claims the right of eminent domain to enable it to do such a business, irrespective of the use to which the current is ultimately put. Of this we shall speak later. The ultimate uses to which the electric current is to be put, must, however, affect the application of the right

of eminent domain, and we must consider the question with those uses in mind.

The constitution of this state, Art. I, sect. 21, "in the Declaration of Rights, provides " that private property shall not be taken for public uses, without just compensation, nor unless the public exigencies require it." And it is held to be necessarily implied that private property cannot be taken for private uses, without the consent of the owner, with or without compensation. And it is objected here that where one man is permitted to take another's property for the purpose of . thereby transmitting an electric current for manufacturing or mechanical purposes, it is subjecting the property to a mere private use.

All .property is held subject to that sovereign power which is called the eminent domain, or superior dominion. *Cottrill* v. *Myrick*, 12 Maine, 222. It is derived from the ancient jus publicum by which all property was held subject to the will of the sovereign. The constitutional provision referred to did not create the power, but is a limitation upon its exercise. Private property can be taken only for public uses, and then only in case of public exigency. Whether there is such an exigency,—whether it is wise and expedient or necessary, that the right of eminent ,domain should be exercised, in case the use is public,— is solely for the determination of the legislature. The legislature however cannot make a private use public by calling it so. 15 Cyc. 580. Whether the use for which it is granted is a public one must in the end be determined by the court. *Kennebec Water Dist.* v. *Waterville*, 96 Maine, 234. The right of the state to condemn property for public uses may of course be exercised through the agency of private corporations, formed for private gain. *Riche* v. *Bar Harbor Water Co.*, 75 Maine, 91. So that the real question before the court now is this: Is manufacturing, generating, selling, distributing and supplying electricity for manufacturing or mechanical purposes, a public use for which private property may be taken by the strong hand of the state? It has been pressed upon us with great force and ability, that the great public benefit and utility of manufacturing enterprises in this state are such as of themselves to give to the creation or development of

power for their benefit the character of a public use. We must therefore inquire to what extent public benefit and utility may be regarded as controlling in determining what is a public use. The term public use is difficult of exact definition, and most courts have avoided giving one. Public benefit is, however, one of the essential characteristics of a public use. There is no doubt that the conception of public benefit and public utility, and the general welfare of the state, even indirectly promoted, has had much to do in tempering the opinions of the courts. The term is a flexible one, and necessarily has been of constant growth, as new public uses have developed. Randolph on Eminent Domain, 35. And it has been said that what is a public use under eminent domain statutes may depend somewhat upon the nature and wants of the community for the time being. *Scudder* v. *Trenton Delaware Falls Co.,* 1 N. J. Eq. 694. It is beyond question that any instrumentality which tends to promote the manufacturing industries of a state, to furnish labor for its mechanics, to create the need of markets for its products, and to develop and utilize its natural advantages, is of great public benefit. And our attention has been called to many cases where this court, in discussing the doctrine of public use, has used expressions similar to those which we have used above. *Spring* v. *Russell,* 7 Maine, 273; *Lawler* v. *Baring Boom Co.,* 56 Maine, 445; *Riche* v. *Water Co.,* 75 Maine, 91; *Hamor* v. *Water Co.,* 78 Maine, 132; *Farnsworth* v. *Lime Rock R. R. Co.,* 83 Maine, 440; *Ulmer* v. *Lime Rock R. R. Co.,* 98 Maine, 580. But it is to be observed that in none of these cases was any question, like the precise one before us, under consideration. In each the question concerned a use which was public even by the narrowest definition of a public use,—a use in which the public had not only an indirect benefit, but in which the public had a right to participate directly. These cases relate to railroads, water companies, boom companies, canals, and the improvement of public streams. As to such cases there is now no doubt. Their uses are rightly deemed public. The public, or such part of the public as has occasion to, may directly enjoy them. Such uses are of great public benefit.

When, however, we leave those classes of cases which are universally regarded as public, and come to those which stand on debatable ground, we find·that the doctrine, that public benefit and utility is a justification for the exercise of the right of eminent domain, has been asserted more especially in four classes of cases; those relating to the development of water power for mills under general or special mill or flowage acts; those arising under drainage acts for the reclamation of wet and marshy lands; those relating to the irrigation of arid lands, and those relating to the promotion of mining. Of the mining acts, outside of states whose constitutions in terms recognize mining as a public use, it may be said that the authorities differ as to the effect of the mere public benefit. *Overman Silver Mining Co.* v. *Corcoran*, 15 Nev. 147; *Consolidated Channel Co.* v. *C. P. R. R. Co.*, 51 Cal. 269. And it was held in *Fallbrook Irrigation Dist.* v. *Bradley*, 164 U. S. 112, that the irrigation acts of the western states are sustainable on the ground of a regulation of the common interests of the owners, a doctrine applied elsewhere to drainage acts.

It is in the early cases in Massachusetts that we find that mill acts, giving the right to flow the lands of others for the purpose of creating a water power for mills, and drainage acts for the reclamation of waste lands, were first sustained under the eminent domain clause of the Bill of Rights. And it would seem that the doctrine has been accepted, in most of the states where it is now in vogue, on the authority of the Massachusetts decisions. The history of those decisions is instructive. In *Fiske* v. *Framingham Mfg. Co.*, 12 Pick. 68, (1831) it was declared that the mill acts, by which the owner of a mill privilege was authorized to build a dam on his own land for the purpose of creating a water power, and thereby flow the water of the stream back upon the land of an upper proprietor, rest only partly for their justification upon the interest which the community at large has in the use and employment of mills, and partly upon the nature of the property which is often so situated that it could not be beneficially used without the aid of this power. See *Veazie* v. *Dwinel*, 50 Maine, 479. In *Boston and Roxbury Mill Corp.* v. *Newman*, 12 Pick. 467, (1832) it was held that the construction under legislative authority of a dam across a navigable arm of the sea for the purpose of obtaining

a head and fall of water, whereby to work grist mills, run manu-
factories, and other mills for other useful purposes, and also to make
an avenue or highway over the dam, was an appropriation to public
uses within the provision of the 10th article of the Bill of Rights.
The court, arguendo, said: "Here was a creation of an immense
perpetual mill power, as well as a safe and commodious avenue.
. . . . . We should be at a loss to imagine any undertaking
. . . . . in which the public had a more certain and direct
interest and benefit." The court cited the mill acts as analogous, on
the ground that they were "greatly beneficial to the public." In
*Hazen* v. *Essex Company,* 12 Cush. 475, (1853) the declared purposes
of the defendant corporation were to improve the navigation of the
Merrimack River, and to construct a dam across it for the purpose of
creating a water power to be used for mechanical and manufacturing
purposes. The court speaking of the latter purpose said: "The
establishment of a great mill power for manufacturing purposes as an
object of great public interest, especially since manufacturing has
come to be one of the great public industrial pursuits of the com-
monwealth, seems to have been regarded by the legislature and sanc-
tioned by the jurisprudence of the commonwealth, and in our judg-
ment, rightly so, in determining what is a public use, justifying the
right of eminent domain." This was affirmed in *Com.* v. *Essex
Company,* 13 Gray, 239, (1859). In *Talbot* v. *Hudson,* 16 Gray,
417, (1860) a large area of land in different towns, and owned by
many owners, was overflowed by water raised by a dam, which it was
sought, under legislative authority, to remove, for the purpose of
reclaiming the land. It was held that the dam could be taken as for
a public use. This language was used: "In a broad and compre-
hensive view, such as has been heretofore taken of the construction
of this clause of the Declaration of Rights, everything which tends to
enlarge the resources, increase the industrial energies, and promote
the productive power of any considerable number of the inhabitants
of a section of the state, or which leads to the growth of towns and
the creation of new sources for the employment of capital and labor,
indirectly contributes to the general welfare and to the prosperity of
the whole community." The mill acts were cited as examples of a

public use, and it was declared that "if it is lawful and constitutional to advance the manufacturing or mechanical interests of a section of the state, by allowing individuals acting primarily for their own profit to take private property, there would seem to be but little if any room for doubt as to the authority of the legislature, acting as the representatives of the whole people, to make a similar appropriation by their own immediate agents in order to promote the agricultural interests of a large territory." The general drainage act for the improvement of meadows was also cited as providing for an analogous public use. But in *Murdock* v. *Stickney*, 8 Cush. 113, (1851) and *Bates* v. *Weymouth Iron Co.*, 8 Cush. 548, it was held that the principle on which the mill acts "are founded is not, as has sometimes been supposed, the right of eminent domain, the sovereign right of taking private property for public use." The mill acts were said to be only a slight modification of the rule of the common law for regulating the rights of proprietors, on one and the same stream, from its rise to its outlet, in a manner best calculated, on the whole, to promote and secure their common rights in it. "Whether," the court say in *Murdock* v. *Stickney*, "if this were an original question, this legislation (a mill act) would be considered as trenching too closely upon the great principle which gives security to private rights, it seems now too late to inquire."

Later the Massachusetts court, in *Lowell* v. *Boston*, 111 Mass. 454, (1873) said that the doctrine of public use asserted in *Hazen* v. *Essex Company*, supra, rested upon the improvement of navigation provided for, and not upon the general benefit flowing from the establishment of mills. And the court in that case said that the mill acts, and drainage acts, as in *Talbot* v. *Hudson*, supra, were not to be justified under the right of eminent domain, and that they involved no other governmental power than that "to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes and ordinances," as the General Court "shall judge to be for the good and welfare of this commonwealth, and for the government and ordering thereof, and of the subjects of the same," Const. of Mass., c. 1, sect. 1, Art. IV. In the same case, speaking of *Dorgan* v. *Boston*, 12 Allen, 223, and *Dingley* v. *Boston*, 100 Mass. 544, in which

the right of eminent domain for certain public improvements was con-
tested, the court used this significant language:—"This benefit"
(the promotion of the general prosperity and public welfare) "was
anticipated, and doubtless was one of the influential inducements to
the adoption of the statutes giving authority for the improvements.
It was not in this general advantage however, that the justification,
under the constitution, for such an exercise of power was found, but
in the direct and special public service." And finally in *Turner* v.
*Nye*, 154 Mass. 579, (1891) where the court sustained the constitu-
tionality of an act authorizing the flowing of flats for the raising of a
pond for the culture of fishes, but expressly on the "good and wel-
fare" clause of the constitution cited by us, and not on the right of
eminent domain, the court said: It is upon this provision (the "good
and welfare" clause) that the mill acts have been placed finally in
this state, after what appear at times to have been somewhat conflict-
ing views. It may be doubted whether, as new legislation, they
could be sustained as an exercise of the right of eminent domain."
If we understand the purport of the latter Massachusetts decisions,
it is to the effect that the earlier cases of *Boston & Roxbury Mill Corp.*
v. *Newman*, 12 Pick. 467; *Hazen* v. *Essex Company*, 12 Cush. 475,
and *Talbot* v. *Hudson*, 16 Gray, 417, are no longer authority for the
doctrine that either the general mill acts, or special legislation for
taking private property for the purpose of creating a water power for
manufacturing purposes can be sustained as involving public uses, on
the ground of great public benefit or utility. We have no such broad
and comprehensive "good and welfare" provision in our constitution
as the one referred to in the constitution of Massachusetts, and if we
had, it is difficult to see why such a legislative authority would not
be limited by the necessarily implied provision that private property
shall be taken only for public uses. Besides it is held, and we think
properly, that the term public use cannot be construed to be the
equivalent of general welfare or public good. It must receive a
more restricted definition. *Kinnie* v. *Bare*, 68 Mich. 625; 1 Lewis
on Eminent Domain, sect. 163.

But following the earlier Massachusetts cases, in time, at least, it
was held in *Great Falls Mfg. Co.* v. *Fernald*, 47 N. H. 444, (1867)

that the legislature had power to authorize a corporation established for manufacturing purposes, to flow back water onto the land of another, without his consent, in order to create the water power used in carrying on their works. This was held to be a public use, on the ground that it was for general public utility, and *Boston & Roxbury Mill Dam Corp.* v. *Newman,* supra, and *Hazen* v. *Essex Company,* supra, were cited as authorities to that effect. The court also cited the "general welfare" clause in the New Hampshire Bill of Rights, similar to that in Massachusetts. The court in New Hampshire did not waver from this public use doctrine, *Ash* v. *Cummings,* 50 N. H. 592; *Amoskeag Mfg. Co.* v. *Head,* 56 N. H. 386; *Amoskeag Mfg. Co.* v. *Worcester,* 60 N. H. 522, except to say that the flowage act went to the verge of constitutional power, *Salisbury Mills* v. *Forsaith,* 57 N. H. 124, until *Rockingham County Light & Power Co.* v. *Hobbs,* 72 N. H. 531, in which case, the court said of *Great Falls Mfg. Co.* v. *Fernald,* supra: That case is sui generis, and is limited to flowage rights. That and other cases cannot be regarded as deciding the "public use" in the Bill of Rights is synonymous with public benefit, public advantage, or any use that is for the benefit and welfare of the state." Nevertheless the court said that the conclusion that the use of land for the production and distribution of power may be a public use is shown by the mill acts and the decisions respecting them, citing the Fernald case in Massachusetts, and its own case of *Amoskeag Co.* v. *Head.*

In Vermont the ruling has been the other way. The court there declined to follow Massachusetts and New Hampshire, and held that under a mill flowage act, the exercise of flowage rights for the benefit of mills, even of grist mills, was not for a public use. *Tyler* v. *Beacher,* 44 Vt. 648. In re *Barre Water Co.,* 62 Vt. 27, it was held that a water Company having authority to take private waters for the extinguishment of fires, and for domestic, sanitary and other purposes, cannot use the water of a private stream for private manufacturing purposes. And in *Avery* v. *Vermont Electric Co.,* 75 Vt. 235, (1903) it was held that the generation of electricity by an individual for the purpose of supplying a railroad company with power to operate its road is not a public use. The court in Rhode Island, we

think, inclines the same way. In re *Rhode Island Suburban Ry. Co.*, 22 R. I. 457; 52 L. R. A. 879. On the other hand the court in Connecticut, in *Olmstead* v. *Camp*, 33 Conn. 532, (1866) holding a flowage act, for the benefit of mills constitutional, as authorizing a taking for public use, declared that it is the settled law of the country that the flowing of lands for mill purposes is a taking for a public use. The court defined public use to be public usefulness, utility or advantage, or what is productive of general benefit, and said that any taking by the state for purposes of great advantage to the community is a taking for a public use, citing *Fiske* v. *Framingham Mfg. Co.*, supra; *Boston & Roxbury Mill Dam Corp.* v. *Newman*, supra, and *Talbot* v. *Hudson*, supra. In *Miller* v. *Troost*, 14 Minn. 365, (1869) the court felt constrained to hold a mill act constitutional, purely on the authority of the cases decided elsewhere, citing *Olmstead* v. *Camp*, supra, and *Fiske* v. *Framingham Co.*, supra. But the court said,—"It is difficult to reconcile these statutes, upon principle, with the constitutional rights of the citizen." In *Newcomb* v. *Smith*, 1 Chand. (Wis.) 71, (1849) a majority of the court held a mill dam and a flowage act constitutional on the authority chiefly of the prior decisions in Massachusetts and New Hampshire. The same court, in *Fisher* v. *Horicon Iron Mfg. Co.*, 10 Wis. 351, (1860) said:—"We are free to confess that if the question as to the constitutionality of the mill dam act was now for the first time presented to this court, and we were not embarrassed by former adjudications upon it, we should doubtless come to a different conclusion upon the question from that arrived at by the majority of the court in *Newcomb* v. *Smith*." That a great public benefit justifies the exercise of the right of eminent domain, as for a public use, in creating or improving water power for manufacturing purposes, is supported on the ground of public benefits, in *Scudder* v. *Trenton Delaware Falls Co.*, 1 N. J. Eq. 694; *Hankins* v. *Lawrence*, 8 Blackf. (Ind.) 266; and perhaps in other states. It is noticeable that the mill acts generally, when sustained, have been sustained under protest. See note to *Turner* v. *Nye*, 14 L. R. A. 487.

In *Varick* v. *Smith*, 5 Paige, (N. Y.) 137, it was held that water could not be diverted for the purpose of creating water power to

lease, because it was not a public use. In *Hay* v. *Cohoes Co.,* 3 Barb. 42, it was denied that the legislature could exercise the right of eminent domain for mills of any kind. See in re *Eureka Basin Warehouse & Mfg. Co.,* 96 N. Y. 42. See also in re *Tuthill,* 133 N. Y., holding a drainage act unconstitutional. In *Gaylord* v. *Sanitary Dist.,* '204 Ill. 576, the court held that a mill act with accompanying right of eminent domain could be sustained for public grist mills, but not for .other mills. The same doctrine is supported in *Harding* v. *Goodlet,* 3 Yerg., (Tenn.) 41. A mill act was held unconstitutional as not being for public uses in *Ryerson* v. *Brown,* 35 Mich. 333, in an able and exhaustive opinion prepared by Judge Cooley, in which he analyzed nearly all the authorities. See *South West Mo. Light Co.* v. *Scheurick,* 174 Mo. 235. When the case of *Amoskeag Mfg. Co.* v. *Head,* supra, was before the Supreme Court of the United States on error, that court declined to express any opinion as to whether the creation of water power for manufacturing purposes was a public use, but rested its decision, sustaining the judgment of the Supreme Court of New Hampshire, on the ground, that a statute that authorized the building of dams, and the raising of water, thereby causing it to flow back upon lands of another, might be considered as regulating the manner in which the rights of proprietors of lands adjacent to a stream may be asserted and enjoyed, with due regard to the interests of all, and to the public good. *Head* v. *Amoskeag Co.,* 113 U. S. 9. See *Wurts* v. *Hoagland,* 114 U. S. 606. This is the doctrine, as we have pointed out, of the later Massachusetts cases. In *Kaukauna Water Power Company* v. *Green Bay Co.,* 142 U. S. 254, the court sustained the taking in that case, on the ground that it was for the improvement of the navigation of a river, but said also: "It is probably true that it is beyond the competency of the state to appropriate to itself the property of individuals for the sole purpose of creating a water power to be leased for manufacturing purposes. This would be a case of taking the property of one man for the benefit of another, which is not a constitutional exercise of the right of eminent domain."

It is suggested by counsel that in this state, the court has already, by implication at least, sustained the doctrine that the creation of

power for manufacturing, either as electrical power or water power, may be regarded as a public use. But that position cannot be sustained. Two cases are cited. In *Edison Co.* v. *Farmington Electric Light & Power Co.*, 82 Maine, 464, although the word "Power" appeared in the corporate name of the defendant, the case does not show what authority it had or claimed as to the creation or distribution of electric power. That question was not discussed in the opinion of the court. The defendant was treated as an electric light company. In *Rockland Water Co.* v. *Camden & Rockland Water Co.*, 80 Maine, 544, the right to the exercise of eminent domain for creating water power was not under consideration.

But *Jordan* v. *Woodward*, 40 Maine, 317, (1855) was a case arising under our mill act. Its constitutionality was sustained, but only on the ground of its great antiquity, and the long acquiescence of our citizens in its provisions. The court said that it pushed the power of eminent domain to the very verge of constitutional inhibition, and added,—"But the reasons in which this policy originated have long since ceased to exist. Private capital has largely accumulated, and now seeks investment in mills of various descriptions, or in other enterprises for private gain. That the existence of water mills is a matter of public convenience at this day is undeniable; so too is the existence of the shop of the smith, the store of the grocer, the house of the innholder, and a great variety of business enterprises in which our citizens employ their labor and capital. In fact, there is no branch of lawful business which may not contribute to the public good, and for which there may, to a certain extent, exist a public necessity. Yet to authorize the appropriation of private property for all these various purposes would be destructive of private rights, and unsettle the tenure by which property is holden." These general views were emphasized in *Allen* v. *Jay*, 60 Maine, 124, and they have continued to express the law of this state until the present time. The doctrine of *Jordan* v. *Woodward*, basing the constitutionality of the mill act upon "great antiquity and long acquiescence" and not upon "public benefit" has never been extended, and we think it should not be. Mr. Lewis in his work on Eminent Domain, after reviewing the cases says, section 181, "Saw mills and grist mills,

carding mills and fulling mills, cotton gins and other mills, which are regulated by law, and obliged to serve the public, are undoubtedly a public use. But, as respects all other kinds of mills, although they may be a public benefit, they are not a public use within the meaning of the constitution." *State* v. *Edwards*, 86 Maine, 102.

Taking the decided cases generally, we think that the weight of authority does not sustain the doctrine that a public use such as justifies the taking of private property against the will of the owner, may rest merely upon public benefit, or public interest, or great public utility. This was, no doubt, the early doctrine in Massachusetts, as applied to mill acts and drainage acts, and we think the cases show that the doctrine was adopted in other states largely on the authority of the Massachusetts decisions. But, plainly, it has since been repudiated by Massachusetts herself. Something more than mere public benefit must flow from the contemplated use. *Gaylord* v. *Sanitary Dist.*, 204 Ill. 576. Public benefit or interest are not synonymous with public use. In re *Niagara Falls Ry. Co.*, 108 N. Y. 375; *Avery* v. *Vermont Electric Co.*, 75 Vt. 235. Neither mere public convenience nor mere public welfare will justify the exercise of the right of eminent domain. *Kinnie* v. *Barr*, 68 Mich. 625. If the doctrine of public utility were adopted in its fullest extent, there would practically be no limit upon the exercise of this power. See *Beekman* v. *S. & S. R. R. Co.*, 22 Am. Dec., note 688, 704.

Judge Cooley, in his work on Constitutional Limitations, 6th Ed., 653, says: "Nor could it be of importance that the public would receive incidental benefits, such as usually spring from the improvement of lands or the establishment of prosperous private enterprises. The public use implies a possession, occupation and enjoyment of the land by the public at large, or by public agencies; and a due protection to the rights of private property will preclude the government from seizing it in the hands of the owner, and turning it over to another on vague grounds of public benefit to spring from the more profitable use to which the latter may devote it." And again on page 655: "That only can be considered a public use where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience

or welfare which, on account of their peculiar character, and the difficulty,—perhaps impossibility—of making provisions for them otherwise, is alike proper, useful and needful for the government to provide." There is perhaps no general definition more satisfactory than this one. And we think there is nothing in the creation and distribution of power for manufacturing enterprises, no matter how great their general utility, which makes it "alike, proper, useful and needful" for the government to provide for it. They are clearly private enterprises, built up by private capital, for private gain. They are not subject to governmental regulation as public enterprises. Their promoters and owners manage them to suit themselves, so long as they do not interfere with the rights of others. The history of water power development in this state shows that private enterprise has been amply able to overcome all obstacles. It is not enough to say, that by converting water power into electric power it can be carried great distances, and applied more economically and profitably. In that way the use of power may be made more convenient. It may tend to the building of more mills, or larger ones. It may be incidentally a public benefit. But it is nevertheless, in its legal aspect, merely an aid to private enterprise. To enable the right of eminent domain to be exercised in such behalf, would be taking the property of one private person for the use of another private person, and this has been denominated "not legislation, but robbery." *Coster* v. *Tidewater Co.*, 18 N. J. Eq. 54. We think it cannot be done without an entire disregard of the constitutional limitation. *Allen* v. *Jay*, 60 Maine, 124.

So far we have considered the general question whether the development of power for manufacturing purposes is a public use, because we have deemed it essential to the correct consideration of the remaining position of the defendants. It is contended that, granting that the manufacturing uses of the current of electricity proposed to be developed are private, nevertheless the powers granted to this corporation are for public uses. The defendant corporation claims that it is a quasi public corporation, charged with the performance of public duties, and subject to governmental regulation, and that it possesses the rights of quasi public corporations, among which may be, if a

statute authorizes it, the right of eminent domain. It says the uses of property taken by it under the right of eminent domain for the purpose of performing its public duties are public uses.

It is generally well settled now that when the legislature grants to a corporation the right of eminent domain, or public rights, like street rights, for public uses, and the corporation accepts and exercises the grant, it thereby impliedly comes under obligation to the public to perform all those duties in which the public are interested, and to aid in the performance of which the right of eminent domain was granted. It can be compelled to perform them, and at reasonable rates. It subjects itself to public regulation and control, and to forfeiture of its charter for failure to perform. It devotes its property to public use, and in a way the public have acquired an interest in the use of the property. *Munn* v. *Illinois*, 94 U. S. 113; *Kennebec Water District* v. *Waterville*, 97 Maine, 185. The public has a definite and fixed right to the use of the property, independent of the will of the owner. In re *Mayor of New York*, 135 N. Y. 253; *Varner* v. *Martin*, 21 W. Va. 534, 15 Cyc. 583; *Jordan* v. *Woodward*, 40 Maine, 317. "Property is devoted to a public use, when, and only when, the use is one which the public in its organized capacity, to wit the state, has a right to create and maintain, and therefore one which all the public has a right to demand and share in." *Budd* v. *New York*, 143 U. S. 517. In a broad sense it is the right in the public to an actual use, and not to an incidental benefit. If it be a railroad company, the public have a right to be transported, and to have their goods carried from place to place, upon payment of reasonable tolls. The company must accommodate them, whether it will or no. If it be a canal or turnpike or bridge, all may travel thereon. If it be a boom company, all who have logs in the river are entitled of right to have the booms used for them. If it be a telephone or telegraph company, its privileges are open to, and compellable by, all. If it be a water company, the entire public has, and must have, a right to the use of the water. These are the more ordinary kinds of quasi public corporations, and they illustrate better perhaps than any definition can express, the particular personal quality of the use which the public as individuals have by right in the

property of such corporations. It is the right of the public as individuals to use, when occasion arises. The use must be for the general public, or some portion of it, and not a use by or for particular individuals. *McQuillen* v. *Hatton,* 42 Ohio St. 202; *Coster* v. *Tidewater Co.,* 18 N. J. Eq. 68; *O'Reiley* v. *Kankakee Valley Draining Co.,* 32 Ind. 169; *Pocantico Water Works Co.* v. *Bird,* 130 N. Y. 249; 15 Cyc. 581. It is not necessary that all of the public should have occasion to use. It may suffice if very few have, or may ever have occasion. *Riche* v. *Bar Harbor Water Co.,* 75 Maine, 91. It is necessary that every one, if he has occasion, shall have the right to use. *Ulmer* v. *Lime Rock R. R. Co.,* 98 Maine, 579. It must be more than a mere theoretical right to use. It must be an actual, effectual right to use, 15 Cyc. 581.

But this public character of a corporation does not follow merely because it has accepted a grant of the right of eminent domain, unless it was granted for public uses. For unless the grant was for public uses, it was unconstitutional and void, and the company by accepting it obtained no rights as a public instrumentality, and came, thereby, under no obligations to the public. Because the legislature assumed to grant the right of eminent domain, and the grant was accepted, it does not follow that the corporation is a quasi public corporation. As we have said, the legislature could not make a use public by declaring it such. The question, after all analyses, must come back to the inquiry whether the declared uses are in law public uses.

Now, we have taken it for granted, that some of the ultimate purposes expressed in the defendant corporation's charter are public ones. We repeat that we think that no one would now deny that electric lighting for the public is a public use, and that a corporation engaged in that business may properly be granted the right of eminent domain for that use. And we have no occasion at this time to deny, that the right of eminent domain might properly be granted to a corporation to enable it to generate, sell and distribute electricity for public lighting, though not a lighting company itself. We are now concerned with the right, under eminent domain, to generate, sell and distribute electricity for power for manufacturing purposes. We suppose that a corporation may be a quasi public one as to

electric lighting for instance, and not as to other, though chartered, purposes, just as, to use a former illustration, a company may be chartered to build and operate an electric light plant, and to run a bank, or cotton mill, or shoe factory. The question now is, was this defendant a quasi public corporation, as respects creating, selling and distributing electric power for manufacturing or mechanical purposes? Because, as we have found, that is the use for which this taking is to be made, if at all. We think that the ultimate use of the power is an important consideration. If that use is essentially a private use, in a private business, will it become a public use by merely multiplying the number of persons who may have occasion to use the power? If it would not be a public use to supply power for one mill, would it be such to supply for two mills, or for six or twelve? We think not. In each individual case it would be supplying the power for a private use. If the state cannot take the property of one and give the use of it to another for private use, can it give the use to that other in order that in the form of electric power he may distribute the use to a dozen others for their private business purposes? We think not. There is no underlying necessity or peculiarity in the business of distributing electric power which requires any such enlargement of the power of eminent domain. There seems to be such a necessity in the cases of all the quasi public corporations which we have mentioned. Railroads, telegraphs, telephone and water companies cannot be built and maintained by individuals for their several use, each one for himself. There is an "impossibility," to use Judge Cooley's words, "of making provisions for them otherwise" than through the power of eminent domain. But every man can, if he wishes, have a mechanical power of his own, either steam, or water, or electric. He can serve himself, without the intervention of the state. Not so conveniently or advantageously perhaps, as it would be to be served by others. But mere convenience and advantage in private business must yield to the property rights of citizens sacredly guarded by the constitution. We cannot find any ground for sustaining the defendant's contention, except that of "public benefit," or general utility, and we think that is not sufficient.

There is, however, one other consideration which we deem to be of weight though perhaps not conclusive, in determining whether the creation and distribution of electric power is a public use.   In all the other public uses which have been referred to, the supplying of them to some does not disenable the company to supply to others.   The use is not exhausted by using.   If the railroad carries one, it is not thereby made less able to carry others.   It is simply a matter of more trains.   In a telegraphic or telephonic service it is simply a matter of more posts and wires.   The capacity is practically unlimited.   In water services, the calls in those public services for which the right of eminent domain is given is usually infinitesimal, in comparison with the supply.   It is practically the same in electric lighting.   The units of service are small ordinarily in comparison with the total capacity for service.   It is practicable to serve all the public.

But a power service is entirely different.   By every unit used, the capacity to serve others is by so much exhausted.   It cannot be used again.   To be useful, power must be constant and steady during all the working hours of the day.   Unless the purchaser can be assured of a definite and stable power, it is of little value.   What he contracts for another cannot have.   Moreover, it is said that the larger the unit, the more economical and profitable.   Counsel for the defendants argues that the best and cheapest service is obtained with the largest possible units.   And further that all power contracts must be time contracts.   Suppose as in this case the first customer agrees to take it all, what is the next customer to do?   There is nothing left for him.   But has not the company the right to sell it all?   And may it not sell it all to the only customer in sight at that time?   Must it reserve a part of its product for contingent later customers?   And may it not contract for long periods of time?   Purchasers will not buy, ordinarily, if they are subject to the necessity of dividing the power with later customers, unless the danger is as remotely contingent as electric lighting seems to be in this case.   When a purchaser contracts for power, he is likely to expend large amounts to enable himself to use it.   It is said in argument that the Hollingsworth & Whitney Company have so spent $100,000 in this instance.   The sum of it is that electric power, generated for sale for manufacturing

purposes, is not ordinarily adaptable to public uses, as legally defined. This company expects to have it for sale, and when it is sold, it is gone. It is no longer for public use.

But the defendant company says it can generate more power for the public, and that it must do so if the public calls for power. No doubt its public duty, if any, is co-extensive with those means which the state has given to it to enable it to perform those duties. The state has given to it the use of the water in the Sebasticook River within certain limits to create power. That is the scope of the charter so far as the creation of power by means of the right of eminent domain is concerned. And if it be a quasi public corporation, for the production of power, when it has fully used the supplies given to it, it can be under no further public duty. No trust is impressed upon the property for any further use, and that is one of the tests of a public use. *Twelfth St. Market Co.* v. *Phila. & T. R. R.,* 142 Pa. St. 580. But suppose it does create more power, the old customer or the first new one, may take it all. Really the right of the public to be served, under such conditions, in any event is purely theoretical, and not effectual. "A particular improvement palpably for private advantage only will not become a public use because of the theoretical right of the public to use it." *DeCamp* v. *Hibernia R. R. Co.,* 47 N. J. L. 43. "A use is not made public by the fact that the public has a theoretical right to use it, or that the public will receive incidental or prospective benefit therefrom." 15 Cyc. 581. The case at bar lacks one of the essential conditions of a public service by a quasi public corporation, namely, the right of the public, or so much of it as has occasion, to be served as a matter of right, and not of grace. *Olmstead* v. *Morris Aqueduct,* 47 N. J. L. 311; *Gaylord* v. *Sanitary Dist.,* 204 Ill. 576. "A use which may be monopolized or absorbed by the few, and from which the general public may and must ultimately be excluded, is in no sense a public use." *Board of Health* v. *Van Hoesen,* 87 Mich. 533.

The recent case of *Fallsburg Power & Mfg. Co.* v. *Alexander,* (Va.) 61 L. R. A. 129, holds that the development of water power by a corporation for the purpose of generating electric power, light and

heat for its own use, or for the use of other individuals and corporations, is a private and not a public use.

Our attention has been called to the recent case of *Rockingham Light & Power Co.* v. *Hobbs*, 72 N. H. 531, as an authority directly in point, and fully sustaining the defendant's contentions. In that case the company was organized for the purpose of creating, furnishing and selling electricity, among other things for the propulsion of cars, and for all mechanical, commercial and . business purposes. The right of eminent domain was granted to it. Under this it took pole and wire rights on the defendant's land. The real purpose of the taking was to furnish power for the operation of lines of electric railway, and also, if it had occasion, to furnish power for any of the purposes authorized by its charter. It may be observed that one of the ultimate purposes of the taking was to furnish power to corporations engaged in a quasi public business, but the court does not rest its decision upon that ground. (And see *Avery* v. *Vermont Electric Co.*, 75 Vt. 235.) It likens the purposes of the power company to those of an aqueduct company and reaffirms the doctrine of *Great Falls Mfg. Co.* v. *Fernald*, 47 N. H. 444, that the use of land for the production and distribution of power may be a public use. This latter doctrine has never been accepted as the law in Maine, and we think that there are vital distinctions between power companies and water companies.

The New Hampshire court uses this language:—"The demand for power . . . . is of a public character. Like water, electricity exists in nature, in some form or state, and becomes useful as an agency of man's industry only when collected and controlled. It requires a large capital to collect, store and distribute it for general use. . . . . It may happen that the business cannot be inaugurated without the aid of the power of eminent domain for the acquisition of the necessary land, or rights in land. All these considerations tend to show that the use of land for collecting, storing and distributing electricity, for the purpose of supplying power and heat to all who may desire it, is a public use, similar in character to the use of land for collecting, storing and distributing water for public needs, a use that is so manifestly public "that it has seldom been

questioned and never denied." It is, perhaps, sufficient to say that we are unable to concur in the reasoning of the New Hampshire court, for reasons already fully stated. The defendants also cite *Salt Lake City* v. *Salt Lake City Water & Electric Power Co.*, 25 Utah, 456. That case involved an appropriation of water by a power company, which was a riparian proprietor, and the questions considered in the case at bar were not discussed.

The record of the case before us shows a vote of the corporation whereby, "in view of the litigation now pending," it recognized itself as a quasi public corporation, and pledged itself to the performance of its duties as such in furnishing the public with electric light and power, and to make all extensions necessary to meet the public demand for light and power. We do not think this vote can make any difference. In a constitutional sense, a use cannot be enlarged, it cannot be made any more public, by a vote. The public duties of a quasi public corporation, except so far as directly imposed by statute, arise by implication of law. If a corporation is not a quasi public one, it cannot make itself such by voting to perform the duties of a quasi public corporation.

Our conclusion is that the acts threatened by the defendants will be an invasion of the plaintiff's constitutional rights, and that he is entitled to a perpetual injunction as prayed for. A decree to that effect will be signed by a single justice.

> *Bill sustained with costs. Decree for a perpetual injunction to issue.*