**OPINION OF THE JUSTICES of the Supreme Judicial Court given under the Provisions of Section 3 of Article VI of the Constitution.**

**Questions Propounded by the Senate in an Order Dated May 15, 1967.**

Supreme Judicial Court of Maine.

June 6, 1967.

SENATE ORDER PROPOUND-
ING QUESTIONS
STATE OF MAINE

In Senate, May 15, 1967

Whereas, it appears to the Senate of the 103rd Legislature that the following are important questions of law, and that the occasion is a solemn one; and

Whereas, there is pending before the Senate a Bill entitled "An Act Relating to Issuing of Parking System Revenue Bonds and Water and Sewer System Revenue Bonds by Municipalities", S.P. 541, L.D. No. 1398; and

Whereas, the constitutionality of said Bill has been questioned; and

Whereas, it is important that the Legislature be informed as to the constitutionality of said Bill;

Now Therefore Be It Ordered, that the Justices of the Supreme Judicial Court are hereby respectfully requested to give to the Senate, according to the provisions of the Constitution on its behalf, their opinion on the following questions, to wit:

I. Will the exercise by a municipality of the power of eminent domain conferred by said Act for the purpose of acquiring land, rights in land or water, or air rights in connection with the construction, reconstruction, improvement, extension, enlargement or operation of a revenue producing municipal "parking facility" as defined in said Act violate either Section 6–A or Section 21 of Article I of the Maine Constitution?

II. Will the enactment of "An Act Relating to Issuance of Parking System Revenue Bonds and Water and Sewer System Revenue Bonds by Municipalities", insofar as it authorizes the issuance of revenue bonds by municipalities for the purpose of paying the cost of acquiring, constructing, reconstructing, improving, extending, enlarging, equipping, repairing, maintaining or operating a revenue-producing municipal "parking facility" as defined in said Act, be for the "benefit of the people of this State" within the meaning of Article IV, PART THIRD, Section 1 of the Maine Constitution?

III. Does Section 4262 of said Act, which provides that no municipality shall be required to pay any taxes or assessments upon any revenue-producing municipal facility, or upon the income therefrom, violate Article IX, Section 8 of the Maine Constitution?

IV. Will revenue bonds or notes issued under the provisions of said Act constitute the creation of a debt or liability of a city or town within the meaning of Article IX, Section 15 of the Maine Constitution if revenues from an existing part of a parking, water or sewer system as defined in said Act are pledged pursuant to the provisions of said Act in addition to revenues produced by the facility within such

system for which the bonds or notes are issued?

Horace O. Hildreth
Name: Hildreth
County: Cumberland

In Senate Chamber
May 15, 1967
Read and Passed:
Jerrold B. Speers
Secretary of Senate

A true copy
  Attest:
Jerrold B. Speers

## ANSWERS OF THE JUSTICES

To the Honorable Senate of the State of Maine:

In compliance with the provisions of Section 3 of Article VI of the Constitution of Maine, we, the undersigned Justices of the Supreme Judicial Court, have the honor to submit the following answers to the questions propounded on May 15, 1967.

■ QUESTION (I): Will the exercise by a municipality of the power of eminent domain conferred by said Act for the purpose of acquiring land, rights in land or water, or air rights in connection with the construction, reconstruction, improvement, extension, enlargement or operation of a revenue producing municipal "parking facility" as defined in said Act violate either Section 6-A or Section 21 of Article I of the Maine Constitution?

ANSWER: We answer this question in the negative. The pertinent provisions of the Maine Constitution are:

"No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of his civil rights or be discriminated against in the exercise thereof." Article I, Section 6-A.

"Private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it." Article I, Section 21.

■ We have consistently regarded the "public use" requisite to undergird the power of eminent domain as requiring something more than "public benefit." In Brown v. Gerald, (1905) 100 Me. 351, 361, 61 A. 785, 70 L.R.A. 472, our court said in part:

"The term 'public use' is difficult of exact definition, and most courts have avoided giving one. Public benefit is, however, one of the essential characteristics of a public use. There is no doubt that the conception of public benefit and public utility, and the general welfare of the state, even indirectly promoted, has had much to do in tempering the opinions of the courts. *The term is a flexible one, and necessarily has been of constant growth, as new public uses have developed.*" (Emphasis ours)

The court in Brown conceived of "public use" in terms of an active and actual use by and a right to use vested in the whole public. At page 373 of 100 Me., at page 789 of 61 A. the court said:

"It is the right of the public as individuals to use when occasion arises. The use must be for the general public, or some portion of it, and not a use by or for particular individuals. * * * It is not necessary that all of the public should have occasion to use. It may suffice if very few have, or may ever have, occasion. * * * It is necessary that everyone, if he has occasion, shall have the right to use. * * * It must be more than a mere theoretical right to use. It must be an actual effectual right to use."

This concept of "public use" was again reflected in Opinion of the Justices (1919) 118 Me. 503, 515, 106 A. 865.

In Crommett v. City of Portland, (1954) 150 Me. 217, 233, 107 A.2d 841, 850 we were faced with the necessity of reconsidering the restrictive implications of the traditional definition of "public use" for eminent domain purposes in the light of the changing conditions and needs of society forecast

in Brown. Clearly there would be no active or actual use by the public in any narrow sense with respect to the "blighted" areas to be taken by eminent domain. In solution of this problem, we said: "It is not necessary, in our view, that an active use be contemplated in a taking by eminent domain. The use may be negative in character. The prevention of evil may constitute a use, and as here a public use. Land may be taken to protect a public water supply, and so here land may be taken to protect the community against the destructive forces mentioned." In so saying, without doubt we narrowed the gap between "public use" on the one hand and "public benefit" and "public purpose" on the other and thus interpreted our Constitution as a live and flexible instrument fully capable of meeting and serving the imperative needs of society in a changing world.

■ The municipal "parking facilities" contemplated in the pending legislation in effect constitute a "public use" by any definition. The public will have full access to the facilities and the right to use the same. A direct benefit will lie in the increased safety of members of the public and their property. In the negative sense delineated in Crommett, the whole public will achieve the prevention of such impediments to safety and welfare as interference with fire and police protection and the safe and free movement of traffic upon the public ways.

The use of eminent domain to provide such municipal offstreet parking facilities has been declared to be non-violative of constitutional requirements in other jurisdictions. Court Street Parking Co. v. City of Boston (1957) 336 Mass. 224, 143 N.E.2d 683; Anno. 8 A.L.R.2d 373 and supplement with cases cited.

■ QUESTION (II): Will the enactment of "An Act Relating to Issuance of Parking System Revenue Bonds and Water and Sewer System Revenue Bonds by Municipalities", insofar as it authorizes the issuance of revenue bonds by munici-

palities for the purpose of paying the cost of acquiring, constructing, reconstructing, improving, extending, enlarging, equipping, repairing, maintaining or operating a revenue-producing municipal "parking facility" as defined in said Act, be for the "benefit of the people of this State" within the meaning of Article IV, PART THIRD, Section 1 of the Maine Constitution?

ANSWER: We answer this question in the affirmative. The reasons are implicit in our answer to Question I. We have concluded that the contemplated municipal "parking facility" will constitute a "public use" for eminent domain purposes. A fortiori, it will constitute a public benefit or in the terms of Article IV, Part Third, Section 1 of the Maine Constitution will constitute an exercise of legislative power which will be for the "benefit of the people of this State."

■ QUESTION (III): Does Section 4262 of said Act, which provides that no municipality shall be required to pay any taxes or assessments upon any revenue-producing municipal facility, or upon the income therefrom, violate Article IX, Section 8 of the Maine Constitution?

ANSWER: This question is answered in the negative.

The pertinent provision of the Maine Constitution reads:

"All taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally, according to the just value thereof; but the Legislature shall have power to levy a tax upon intangible personal property at such rate as it deems wise and equitable without regard to the rate applied to other classes of property." Article IX, Section 8.

■ Property of a municipality appropriated to public uses may be exempt from taxation. See Inhabitants Boothbay v. Inhabitants Boothbay Harbor, (1952) 148 Me. 31, 88 A.2d 820; 36 M.R.S.A., Sec. 651,

subd. 1, par. D. There is no constitutional objection to extending the exemption beyond the bounds of the owning municipality. Section 4251 provides that a municipality may acquire, etc. water and sewer systems within or without the municipality and "a parking facility within the corporate limits of the municipality."

Further, under Section 4262 we note that the lessee or person in possession of a parking facility or any part thereof bears the burden of taxation. The exemption covers only the municipality.

No constitutional question on tax exemption is raised by the method of financing. Whether the facility is financed by revenue bonds, as here provided, or through taxation is not material. Tax exemption here rests on the *public purpose* of the facility.

■ QUESTION (IV): Will revenue bonds or notes issued under the provisions of said Act constitute the creation of a debt or liability of a city or town within the meaning of Article IX, Section 15 of the Maine Constitution if revenues from an existing part of a parking, water or sewer system as defined in said Act are pledged pursuant to the provisions of said Act in addition to revenues produced by the facility within such system for which the bonds or notes are issued?

ANSWER: In the Municipal Industrial and Recreational Obligation Act of 1965 which we discussed in Opinion of the Justices, 161 Me. 182, 203, 210 A.2d 683, and in which we advised that the obligation securities which might be issued under the Act would not constitute a debt within the meaning of limitation of Article IX, Section 15 of our Constitution, the Act provided that the securities should be redeemed "solely from revenues of the project for which they are issued."

The present measure (Sec. 4252, Subsection 2) provides that the bonds shall be redeemed "solely from the funds provided therefor." The "funds provided therefor" are funds created by the payment of the charges fixed for the services furnished by the revenue producing facilities "together with all other funds available for the purpose." (Sec. 4253, Subsection 1). The meaning of this quoted phrase is not clear. We assume that funds available for the purpose are circumscribed by Section 4251, Subsection 5 which limits them to the revenues from the water, sewer and parking systems contemplated by the Act. So interpreted, funds available for the purpose may include income from water, sewer or parking facilities which are not financed by the proceeds of the bonds issued under this Act. (Secs. 4255, 4253, 4256, and Sec. 4251, Subsection 5). There is a prohibition against the conveyance or mortgage in support of the bonds of any revenue producing facility or system including such facility (Sec. 4256), and declaration that the bonds shall not be deemed a debt or liability of the municipality.

Here a caveat must be entered. It is not clear whether the Act contemplates the use of water system revenues to service and redeem sewer and parking facility bonds and similar cross overs from sewer and parking system revenues. While such application of revenues would not affect the question addressed to us, it might well raise handicapping issues.

Phrasing Question IV in specifics, is the municipal debt limit affected by the provision which permits the income from existing municipal water, sewer and parking systems to be applied to the debt created by the construction of like facilities under this Act?

Categorizing the fund from which the Industrial and Recreational Bonds, discussed in 161 Maine at page 203, 210 A.2d 683, were to be paid as a "special" fund we have here a "modified special" fund. The principle is the same. The general credit of the municipality is not obligated. The modified special fund is not created in whole or in part from taxes levied upon the assessable property of the municipality. The obligee of the bond may look only to

the modified special fund for his pay. The obligation securities so proposed would not constitute a debt of the municipality within the limitation of Article IX, Section 15 of our Constitution.

 If the phrase appearing in Subsection 1 of Section 4253 "all other funds available for the purpose" contemplates the inclusion of tax revenues, our answer would be in the affirmative.

Respectfully submitted:

ROBERT B. WILLIAMSON

DONALD W. WEBBER

WALTER M. TAPLEY, Jr.

HAROLD C. MARDEN

ARMAND A. DUFRESNE, Jr.

RANDOLPH A. WEATHERBEE