COZARD v. HARDWOOD CO.

(Filed October 17, 1905).

*Tramways—Constitutional Law—Injunctions—Eminent Domain—Public Use—Timber Lands.*

1. The fact that proceedings had been instituted before a Highway Commission to acquire a right of way for a tramway or railway, and were pending in the Superior Court, does not prevent the court interfering by injunction with the construction of the proposed railway, where the result of that proceeding could not affect the plaintiff's right to enjoin the defendants.

2. The amendment made to sections 2056-2057 of The Code, by chapter 46, Laws of 1887, in so far as it authorizes owners of timber lands to condemn a right of way for tramways or railways over the lands of other owners for the exclusive use of the owners of the timber, is unconstitutional, in that private property can only be taken for a public use.

3. The question, what is a public use, is always one of law. Deference will be paid to the legislative judgment as expressed in enactments providing for the appropriation of property, but it will not be conclusive.

ACTION by H. O. Cozard against Kanawha Hardwood Co., heard by *Judge G. S. Ferguson* at Chambers, in Waynesville, N. C., on August 25, 1905, upon a motion by the defendants to dissolve the temporary restraining order theretofore granted. From an order continuing to the hearing the said restraining order, the defendants appealed.

Plaintiff alleged that he was the owner of a tract of land in Cherokee County, upon which he had erected a dwelling and planted a large number of fruit trees and made many other valuable improvements requiring outlay of many thousand dollars. That the defendants are partners conducting a general lumber business under the firm name and style of the Kanawha Hardwood Co. That defendants are threatening and pursuant to such threats proceeded to construct a

railway over and through his lands for the purpose of haul-
ing timber and timber products from their own lands. That
in grading the route for such railway and erecting trestles
over the mountain, great and permanent damage will be done
his property, etc. He applied to the resident judge of the
district for a restraining order until the hearing and a per-
manent injunction, etc. Upon the return day of the order
to show cause, His Honor, *Judge Ferguson,* upon hearing the
complaint and answer supported by affidavits, found the fol-
lowing facts: The defendants, after notice, applied to the
Highway Commission of Valleytown Township in said
county for a right of way to construct and operate a private
railroad from the town of Andrews, a railroad station on the
Southern Railway, to standing timber owned by the defend-
ants in Graham County, which right of way would pass over
the plaintiff's land. The plaintiff filed an answer to the peti-
tion. From the order the Highway Commission, finding that
it was necessary, reasonable and just that the petitioners
should have the right of way, and appointing a jury to lay it
off, plaintiff appealed to the Board of Commissioners of
Cherokee County. From the order of the said Board of Com-
missioners, affirming the proceedings of the Highway Com-
mission, the plaintiff appealed to the Superior Court. The
appeal is now pending in said court. That the defendants
are the owners of standing timber from which no public road
leads and to which no water is convenient; that the proposed
road leads from a railroad station to such standing timber,
and that such standing timber cannot be marketed with a
profit to the defendants without the construction of a railroad.
That the construction of a railroad is necessary for the profit-
able marketing of such timber, and that the route across the
plaintiff's land is a reasonable route; that in taking such
route no injustice is done the plaintiff; that there is no rea-
son why his land should not be taken as well as the land of any
others over which the road might be constructed; that five

years will not be an unreasonable time in which to remove such standing timber.

Defendants have graded a considerable portion of the proposed road, not on the lands of the plaintff, but other portions of the proposed route; they have bought and contracted for iron rails, locomotives and other appliances for operating said road.

Defendants are not a corporation, and do not propose to become liable as common carriers, but propose to construct and use the road for their sole and exclusive use in removing their timber and timber products from their lands in Graham County to the railroad station at Andrews and to the markets. There are other large boundaries of timber land of like kind contiguous to the defendants' timber. Defendants do not propose to transport over their proposed railroad such timber for reasonable charges to be fixed by the Corporation Commission or other authority of the State. Defendants do not claim any other right to enter upon plaintiff's land other than such as they acquired by the order of the Highway Commission. His Honor upon the foregoing facts continued the injunction to the hearing. Defendants appealed.

*Jones & Johnston* and *Shepherd & Shepherd* for the plaintiff.

*Dillard & Bell* for the defendants.

CONNOR, J., after stating the case: The defendants insist that pending the proceeding instituted before the Highway Commission, the court should not interfere by injunction with the construction of their proposed railway. This contention would be unanswerable but for the fact that plaintiff insists that in no point of view can the result of that proceeding affect his right to enjoin defendants, for that, 1. No power is conferred upon the Highway Commission to order a

railway of the character or for the purpose contemplated by the defendants, to be laid out. 2. That if the statute undertook to confer such power it would be invalid, violating the elementary principle that private property can only be taken for a public use, and then with compensation.

These contentions render it necessary to examine the provisions of the statute creating the Highway Commission of Valleytown Township, chapter 210, Public Laws 1905.

By the first section of the statute, provision is made for electing three persons, who shall constitute the Highway Commission for said township, naming those who shall act until the time appointed for the first election. By the second section, the Commission is vested with the powers, rights, etc., exercised by the Board of Supervisors of Public Roads, etc. "They shall have full power and authority to order the laying out of public roads, etc. They shall also have power and authority to lay out cartways, rights of way for tramroads, church and mill roads, and to discontinue the same in the way and manner provided in sections 2033, 2056, 2057, 2062-63 of The Code, or any amendments thereof." It is clear that the Highway Commission established by the act has no larger or other power in regard to ordering cartways or tramways to be opened than is exercised by the boards having jurisdiction over such matters. under the general public laws. It is equally clear that the road proposed to be opened and operated does not come within the definition of cartways provided by sections 2055-57 of The Code. This right is conferred only on persons "settled upon or cultivating any land." The cartway authorized to be opened, "shall be kept open for the free passage of all persons on foot or horseback, carts and wagons." Section 2057 provides that persons over whose lands cartways have been opened, "may erect gates or bars across the same." The section was amended by chapter 46, Laws 1887, by inserting in line one, the words "or shall own any standing timber," and in lines six and fif-

teen, between the words "cartway" and "to" the words "tram or railway." In line eighteen striking out the word "way" and inserting the words "cartways established under this act." Section 2057 is amended by inserting in line one the words "tram or railways" and by inserting in line six between the words "just" and "and" the words "cartways, tramways, or railways for the removal of timber shall continue for a period not longer than five years, and in entering cultivated land shall protect the same by sufficient stock guards." The effect of these amendments is to confer upon owners of land upon which there is any standing timber the right to have opened tramways or railways, with the exclusive use of them, confining to cartways the right of all persons to pass over them. The right to maintain such tramways or railways is confined to a period of five years, with the duty of erecting stock guards when they pass through cultivated land, thus depriving the owner of the land through which such tram and railways pass, the right to erect gates or bars across them. It appears that the Highway Commission ordered the laying out of a private way for a private railway through and over the plaintiff's land, with such curves and grades as are necessary according to the survey made in order to reach the lowest gap on top of the mountain * * * Said right of way, when it extends through woodland, or said tract, to be of the width of one hundred and fifty feet, and through cultivated fields or cleared land to be of sufficient width for the roadbed, trestles and cuts only.

The construction of section 2056 of The Code, being chapter 508, Acts 1798, providing for the opening of cartways, has been frequently before this court; its constitutionality has never been questioned and is not involved in this appeal. The validity of similar statutes has been discussed and sustained in other jurisdictions upon the ground that although established and opened upon the petition of private landowners, and primarily for their benefit, they are, as provided

by our statute, open for the free passage of all persons on horse, foot, in wagons or carts. This extension of their use impresses upon them a public character. In this way the power to invoke the right of eminent domain for the purpose of opening and maintaining them, is sustained. It is said, "Roads and streets used by the public with a right in all the public to use them, are undoubtedly public, and private property may be appropriated for the purpose of constructing such ways. The test is, not simply how many persons do actually use them, but how many have a full and unrestricted right, in common, to use them; for if the public generally are excluded, the way must be regarded as a private one. If the public have the right to use the way at pleasure and on equal terms, it is a public one, although in reality it is little used. When the way is a private one, the right of eminent domain cannot be successfully invoked * * * The right itself exists only for the public, and no private interest, however weighty, can call it into exercise. The question, therefore, must always be, not what private interests will be promoted, but what is the public requirement? The name given the way does not determine its character, for if a road be called a private road or a neighborhood road, but is in fact, so laid out and maintained as to give the public a right to freely use it, upon terms common to all, the road, notwithstanding its name, is a public one." Elliott on Roads (2nd Ed.), section 192. The converse of the proposition is stated in section 193, that if the road is so laid out as to give only a limited class of persons the sole right to use it, it is for that reason a private road, without regard to the name by which it is known or called. "If a class, to the exclusion of the citizens generally, acquire a right to use the road, it is no more than a private way." *Ibid.* Discussing the same question, it is said: "Where the road laid out on the application and paid for and kept in repair by a particular individual, who is especially accommodated thereby, is, in fact, a public

road, and for the use of all who may desire to use it, then it is regarded as accomplishing a public purpose for which the land may be condemned. But when the road, after being laid out, becomes the property of the applicant, from which he may lawfully exclude the public, then the use is strictly private and the law authorizing the condemnation of property is void." Lewis Em. Dom., 167. Speaking of private cartways over which the public are allowed to pass, the author says: "The roads here provided for are *quasi* public, and have been sustained as a valid exercise of the power of eminent domain * * * It has never, we think, been decided in any case that private property could be condemned for a private road for the exclusive use of the applicant, and we know of no principle upon which such a proceeding can be justified." *Ibid.* A statute similar to section 2057, as amended by chapter 46, Laws 1887, was enacted by the Legislature of Pennsylvania for the benefit of owners of land upon which there were deposits of anthracite coal. In *Waddell's Appeal,* 84 Pa. St., 90, the validity of the act was discussed and denied because the way authorized to be opened was not for the use of the public. The Supreme Court of Indiana in *Wild v. Deig,* 43 Ind., 455, said: "Concede that the public exigency requires that a way should be opened to every man's farm, and that the State may and should provide for the establishment of a public road or highway to enable every citizen to discharge his duties and travel to and from his farm; it does not follow that such ways should be private and owned by the party applying for them. If it would be of public utility to establish the road, then it should be a highway. If not, then the right of eminent domain cannot be exercised to establish it. It is not the amount of travel, the extent of the use of a highway by the public, that distinguishes it from a private way or road. It is the *right* to so use or travel upon it—not its exercise." In a well considered opinion delivered by *Dillon,*

*C. J., (Bankhead v. Brown,* 25 Iowa, 540), it is said: "Could not the plaintiffs in this case, after having procured the road in question, abandon it at their pleasure? Could they not relinquish it to the defendants without consulting the board of supervisors? If this is so, does it not incontestably establish that it is essentially *private?* For it must be private if it is of such a nature that the plaintiffs can at their pleasure use or forbid its use, abandon or refuse to abandon it, relinquish or refuse to relinquish it."

The defendants' counsel, in an able and interesting argument before us, conceding the general principle governing the right to take private property, or impose burdens thereon, insist that by reason of the peculiar conditions developed by the affidavits in the record, the use for which the plaintiff's land is sought to be subjected to the easement, is public in its character. They call to our attention the large and valuable timber standing upon the mountains of Western North Carolina, the removal and marketing of which brings wealth into the State, opens the land to cultivation and homes for the people now there and who are coming into that section of the State. They say that while the logs may be hauled over the mountain roads, but at very large expense, the portions of the trees, limbs, tops, etc., unfit for lumber, which are now wasted, may be made useful and valuable for many purposes, and that it is their purpose to establish tanneries and factories for utilizing these products, etc. That by these means the revenues of the State will be increased, the development of the natural resources encouraged, immigration brought into that section, and many other benefits accrue to the public. These views, with the facts upon which they were based, were presented with much force by counsel. They have received, as they were entitled to, most careful consideration. They have been made in other cases in other courts. They invite courts to find in the term "public use" a broader and larger meaning. Their persuading and almost compelling

force may be seen in the legislation of the States and the decisions of the courts. While they have, in some cases, stimulated material growth and development, it is manifest that valuable private property rights and stores of natural wealth and resources for feeding, clothing and making comfortable the rapidly increasing population have been sacrificed to them. That great and dangerous monopolies have been fostered by the liberal construction put upon the term "public use." It has sometimes happened that a stubborn and possibly sentimental owner of land has stood in the way of the development of the country and of the impatient, strenuous promoter and industrial pioneer. It may be that his rights have not received either in the Legislature or the courts the consideration to which they were entitled. It is conceded that courts and authors have found much difficulty in defining the term. It does not concern us to attempt to do so to any other or further extent than is necessary to a decision of this appeal. Mr. Lewis, after an interesting discussion of the subject, says: "Perhaps no better example of a public use can be given than that of the ordinary highway, when the easement or right of way vests in the public for the common and equal use of all." Section 166. The terms upon which the public may use the highway are of course subject to legislative regulation, as on railroads or steamboats, by paying the prescribed fare, going upon and leaving at regular stations, and conforming to those reasonable regulations made by the corporation or other agency for the protection of the public; and on the ordinary country highways, by conforming to those statutes or immemorial customs which have become the "law of the road," etc. In *Pittsburg, etc., R. Co. v. Iron Works,* 2 L. R. A., 680 (West Va.), the term "public use" as applied to the right of a railroad company to condemn private property for the purpose of constructing a lateral road to reach a particular customer, is discussed and the authorities reviewed, *Johnson, P.,* concluding his opin-

ion: "As far as the public is concerned, when what they need is for 'public use,' they have a right to invoke the exercise of eminent domain; but in so far as that which concerns them as to their private interests, their profits and gains is concerned, they stand as individuals or as merely private corporations in which the public has no concern, and for such private purposes cannot call into exercise the power of eminent domain."

In reply to the argument of counsel that by such holding a deadly blow was aimed at the industires of the State, the learned judge said: "It seems to us if railroad corporations were permitted *ad libitum* to do what this,defendant in error asks to be done, no deadlier blow could be dealt at the private rights of the citizen." "The true criterion by which to judge of the character of the use is whether the public may enjoy it by right or only permission, and not to whom the tax or toll for supporting them is paid." Note, 2 L. R. A., 682; 15 Cyc., 583; *Board of Health v. Van Hoesen,* 87 Mich., 533; 14 L. R. A., 114.

The question presented by this appeal and the argument to sustain the right was discussed in *Healy Lumber Co. v. Morris,* 63 L. R. A., 820 (Wash.). A statute similar to ours, as amended, was enacted, enabling owners of timbered lands to condemn a right of way for tramroads and railroads for the purpose of transporting timber to market. The exact question before us was presented, *Dunbar, J.,* saying: "This case presents the important question, deserving the most serious consideration, involving as it does the respective interests of private rights and of property of the State sought to be protected and fostered through the exercise of the high prerogative of sovereignty; the former being guaranteed by the fundamental law, and the latter being the subject of universal interest and concern. Eminent domain is the right or power of a sovereign State to appropriate private property * * * The learned attorney for appellant has favored

Cozard *v.* Hardwood Co.

the court with an exhaustive and earnest argument in his brief, and a painstaking showing is made of the magnitude of the lumbering business and interests of this State, and the effect that it presumably has upon the general prosperity of the Commonwealth; and we are urged to announce a broad and statesmanlike principle in determining this question, and one which would further business prosperity of the State, rather than one which would hamper and retard it. But the court cannot invade the province of the law-making power of government and intrude into its decrees its opinions on questions of public policy. Its duty is to strictly recognize its legal limitations, and confine itself to the narrower duties of interpretation and construction." To the argument that a liberal construction should be given to term "public use," because in the section of the State in which the proposed road is to be built the removal of the standing timber is promotive of the improvement of that section, the answer is that "The Constitution is the fundamental law. Its enactments, whether they constitute grants or limitations, are presumed to be stable and uniform and to constitute a check on the more mutable sentiment and actions of members of different Legislatures. And it seems to us that the result of such construction would be a virtual removal of any constitutional inhibition on legislative power in this respect." *Ibid.* There is a distinction between public policy or public welfare and publc use. "It might be of unquestionable public policy and for the best interest of the State to allow condemnation of lands in every instance where it would result in aiding prosperous business enterprises which would give employment to labor, stimulate trade and increase property values and thereby increase the revenues of the State, even if the enterprises were purely private, for such is the relation, under our form of government, between public and private prosperity, that one cannot be enjoyed to any appreciable extent without favorably influencing the other. But it is evident that this

was not the kind of public use that was within the minds of
the framers of the Constitution, and it seems to us that the
logic of those courts which have sustained appellant's conten-
tion, is justified solely on the grounds of public policy." *Ibid.*
The question is exhaustively discussed in *Bloodworth v. M.
& H. R. R. Co.,* 18 Wend., 9; 31 Am. Dec., 311, in which it
is said: "When we depart from the natural import of the
term 'public use' and substitute for the simple idea of a pub-
lic possession and occupation that of public utility, public
interest, common benefit, general advantage or convenience,
or that still more indefinite term, public improvement, is
there any limitation which can be set to the exertion of legis-
lative will in the appropriation of private property? The
moment the mode of its use is disregarded and we permit
ourselves to be governed by speculations upon the benefits
which may result to localities from the use which a man or
set of men propose to make of the property of another, we are
afloat without any certain principle to guide." *Judge Cooley*
says: "It seems not to be allowable, therefore, to authorize
private roads to be laid out across the lands of unwilling par-
ties by an exercise of this right. The easement in such case
would be the property of him for whom it was established."
Const. Lim., 652. To the suggestion that only an easement
for the period of five years is imposed upon plaintiff's land
and that such period is a reasonable time to remove the tim-
ber, we quote the same eminent authority: "And although the
owner would not be deprived of the fee in the land, the bene-
ficial use and exclusive enjoyment of his property would in
greater or less degree be interfered with. Nor would it be
material to inquire what *quantum* of interest would pass
from him; it would be sufficient that some interest, the ap-
propriation of which detracted from his right and authority
and interfered with his exclusive possession as owner, had
been taken against his will; and if taken for a purely private
purpose, it would be unlawful." *Ibid.* Again he says: "The

*public use* implies a possession, occupation of the land by the public at large or by public agencies." *Ibid.*

Without pursuing the subject further, we entertain no doubt that the amendment made to section 2056-2057 of The Code, by chapter 46, Laws of 1887, in so far as it authorizes owners of timber lands to condemn a right of way for tramways or railways over the lands of other owners for the exclusive use of the owners of the timber, is unconstitutional and invalid. This conclusion does not affect the right of condemnation of a cartway as provided by the statute over which all persons may pass, etc. We see no objection to the extension of this privilege to owners of timber lands under the same limitations and conditions as persons settled upon or cultivating lands. It is manifest that the defendants are not seeking this restricted right. They say that it is their purpose to construct the railway for their exclusive use. This concession deprives them of the benefits of the statute, eliminating the amendment of 1887. Counsel call to our attention the decisions of this court sustaining the drainage acts. Without discussing these acts, it is sufficient to say that they expressly confer upon all persons having lands adjoining or capable of drainage through the drains or canals authorized to be opened, the right to avail themselves of these benefits. This distinguishes those statutes from the one under discussion. It is also contended that it is peculiarly the province of the Legislature to say what is a public use, and that its decision may not be reviewed by the courts. While it must be conceded that expressions are to be found in decided cases, several of which are cited by counsel, and in some text books which seem to sustain this contention, it will be found that they are subject to the limitation that the question is primarily one for the Legislature, but its decision is not conclusive, otherwise the Legislature could nullify the principle protecting private property. The correct view is stated by *Judge Cooley:* "The question, what is a public use, is always

one of law.　Deference will be paid to the legislative judgment as expressed in enactments providing for the appropriation of property, but it will not be conclusive."　Const. Lim., 660.　*Pittsburg, etc., R. Co. v. Iron Works, supra.* "The question, whether a particular use is public or not, is ultimately a question for the courts.　This is necessarily true in view of the constitutional provisions of the different States that private property can be taken only for a public use, since the interpretation of constitutional provisions is within the province of the judiciary."　10 A. & E. Enc., (2 Ed.), 1066; *Call v. Wilkesboro,* 115 N. C., 337, in which *Shepherd, C. J.,* says: "Whether a particular use is public or not, within the meaning of the Constitution, is a question for the judiciary." Citing Lewis on Em. Dom., 185; Mills on Em. Dom., 10-11. The distinction is this—whether a use is public is for the ultimate decision of the courts.　If the use is public, the expediency or necessity for establishing it is exclusively for the Legislature.　In the discussion of the questions presented, we have assumed that the provisions limiting the power of the Legislature to take private property, were constitutional.　As is well known to the profession, no such provision is found in our State Constitution, but since the opinion of *Ruffin, C. J.,* in *Railroad v. Davis,* 19 N. C., 451, the principle has been treated as fundamental and as existing with the same universal application as if imbedded in the Constitution. *Rodman, J.,* in *Johnston v. Rankin,* 70 N. C., 555, says: "The principle is so grounded in natural equity that it has never been denied to be a part of the law of North Carolina." *R. R. Co. v. Platt Land,* 133 N. C., 266.　While, as found by His Honor, it is reasonable and even necessary to the successful operation of defendant's enterprise that they carry their timber and timber products over plaintiff's land to reach the markets, and while there may be no injustice to him in permitting them to do so, and while his opposition may be either sentimental or selfish, yet the courts may not violate or weak-

en a fundamental principle upon the strict observance and enforcement of which the security of all private property, so necessary to the safety of the citizen, is dependent. The guaranties upon which the security of private property is dependent are closely allied, and always associated with those securing life and liberty. Where one is invaded, the security of the others is weakened.

The judgment of His Honor continuing the injunction must be

Affirmed.