# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## BOYD v. C. C. RITTER LUMBER COMPANY, INC.

### June 22, 1916.

### Absent, Sims, J. *

1. EMINENT DOMAIN—*Taking Private Property for a Private Use.*—Although not expressly forbidden by the Constitution of this State, the legislature cannot authorize the taking of private property for private use under any conditions or stipulations, as it is forbidden by the fundamental principles of a republican form of government

2. STATUTES—*Foreign Statute—Interpretation by Foreign State—Constitutionality.*—While the interpretation by the highest court of a State from which a statute is taken will be followed, the legislature cannot, by enacting a statute which has been held constitutional and valid by the highest court of another State, deprive the courts of this State of the right to determine for themselves the constitutionality of such statute.

3. EMINENT DOMAIN—*Exercise of Right by Private Persons or Corporations—Prerequisites.*—Where the property to be condemned is to come under the control of private persons or corporations, the following conditions must exist: First, The general public must have a definite and fixed use of the property to be condemned, a use independent of the will of the private person or corporation in whom the title of property, when condemned, will be vested; a public use which cannot be defeated by such private owner, but which public use continues to be guarded and controlled by the general public through laws passed by the legislature; second, This public use must be clearly a needful one for the public, one which cannot be given up without obvious general loss and inconvenience; third, It must be impossible, or very difficult at least, to secure the same public uses and purposes otherwise than by authorizing the condemnation of private property.

4. PUBLIC USE—*What Is—How Determined.*—Public use means a use by the public, and whether a particular use is public or not is a question for the judiciary and not for the legislature. The legislature cannot make a private use public by calling it so, in order to justify the exercise of the power of eminent domain. The question of its public character must be determined by the courts.

* Submitted before the term of Judge Sims began.

5. EMINENT DOMAIN—*Tram Roads—Interest of Public in Use—Acts of 1912,
   Chapter 75, Unconstitutional.*—Before a private corporation, operating
   its own saw mill and tram road, can be given the right to exercise the
   power of eminent domain, it must appear to the court clothed with
   authority to confer the power that the use by the general public of the
   property to be condemned is definitely fixed, and its use cannot be
   defeated by such private owner, nor the right of the public to the use
   of the property be withdrawn, denied or gainsaid.   The public use must
   dominate the private gain.   Tested by these principles chapter 75 of
   Acts of 1912, allowing mining, manufacturing, and lumber companies
   to condemn private property for passways, tram roads, haul roads
   and other means of transportation, does not confer upon the public
   such interest in, or control over, the roads as to render the use a pub-
   lic use, and is unconstitutional.

Error to a judgment of the Circuit Court of Buch-
anan county, on a petition to condemn land for a
tram road.   Judgment for the petitioner.   Defendant
assigns error.

*Reversed.*

The opinion states the case.

*T. C. Bowen*, for the plaintiff in error.

*George W. St. Clair* and *Flannagan & Boyd*, for the
defendant in error.

CARDWELL, P., delivered the opinion of the court.

This is a proceeding under chapter 75 of Acts 1912,
instituted by the C. L. Ritter Lumber Company, Inc.,
against Marvin Boyd, seeking to condemn a portion
of defendant's land, located on Dismal creek, in Buch-
anan county, for the purpose of constructing a tram
road to haul logs and lumber owned by the petitioner
over the land sought to be condemned.   The purposes

for which the land is sought to be condemned, as stated in the petition to the Circuit Court of Buchanan county, are, to transport logs, timber and supplies over a tram road to be constructed on the same, to be used for the benefit of the petitioner and the public generally.

It is shown by the record that the defendant and the petitioner could not agree as to the location of, or the amount of damages to be paid for, the land proposed to be condemned, and according to the provisions of the statute commissioners were appointed by the circuit court to view the land proposed to be taken, and to lay off and set apart a sufficient portion thereof for the purposes mentioned in the petition, etc. The commissioners so appointed filed their report, as provided in the statute, which the court, by its final order entered on the 5th day of May, 1916, confirmed, and the right of way and tram road over the defendant's land was established in accordance with the prayer of the petition of the lumber company, to which final order this writ of error was awarded.

The sole question requiring our consideration is whether or not the act under which this proceeding is had violates either the Constitution of the State of Virginia or the Constitution of the United States.

The act is entitled, "An act to facilitate the development of the resources of the State by providing ways of ingress and egress for mining, manufacturing and timber cutting, and to authorize proper passways, tramroads, haulroads and other means of transportation over the lands of another or others." The first and second sections of the act provide for the procedure to be had before the land sought to be taken is condemned, and the third section of the act provides as follows:

"But nothing in this act shall operate to give any person, firm or corporation, a right to the exclusive use of such lands, passways, tramroads, haul-roads or other means of transportation; and the public shall have the right to use the said land for travel as other public roads are used, and any other person, firm or corporation shall have an equal right to use the said passways, tramroads, haul-roads or other means of transportation upon paying proper compensation therefor. If no agreement can be made for such compensation, then the amount thereof shall be fixed by the circuit court of said county upon the petition of the person, firm or corporation desiring to use the same, and upon the payment of the amount so fixed by said court, he shall have the right to the use thereof as herein provided.

"Provided, further, that if said land shall cease to be used for the period of five years for the purposes of hauling or delivering minerals, oils, timber, lumber, wood, bark, or other forest product in the manner hereinbefore provided, the same shall be deemed to have been abandoned and the right and title thereto shall revert to the owner of the residue of the tract."

The Constitution of Virginia, section 58, provides; "It (the General Assembly) shall not enact any law whereby private property shall be taken for public uses without just compensation." And the Federal Constitution, Art. 5, provides: "Nor shall private property be taken for public use without just compensation."

While, under both of these constitutional provisions private property may be taken for public uses upon the payment of just compensation, it has been universally held that the spirit of both constitutions is in conflict

with the view that private property can be taken for private uses under any conditions or stipulations.

It plainly appears in this case that the object of the defendant in error is to condemn the land of the plaintiff in error for the purpose of enabling it to build a tramroad over the lands of plaintiff in error on which to transport about forty million feet of timber, owned by it on the waters of Dismal creek, to its mill at Whitewood, in Buchanan county, a distance of about seven miles. The defendant in error is engaged in the lumber business—that is, the purchasing of trees in Buchanan county, the sawing and manufacturing of these trees into lumber at its mill at Whitewood, and shipping the finished products from Whitewood to Doran, a point on the Clinch Valley division of the Norfolk and Western railway, a distance of fourteen miles from Whitewood. The lumber and its finished products are taken over a tramroad with steel rails, and the right of way, track and rolling stock thus used is the private property of the defendant in error. It is also operating a tramroad, with steel rails, extending from its mill at Whitewood in a westerly direction down Dismal creek, in Buchanan county, a distance of approximately seven miles, which tramroad, tracks, steel rails and rolling stock are the private property of the company. Several miles farther down the creek defendant in error owns a large boundary of valuable timber, approximately forty million feet, and desires to extend its tramroad over the lands of plaintiff in error to the said boundary of timber, for the purpose of cutting and hauling it over the tramroad to its mill at Whitewood, and there sawing and manufacturing it into lumber, and then transporting the finished products of the lumber to Doran; and in order to reach this large and valuable boundary of timber it is

necessary to extend its tramroad through and over the lands of the plaintiff in error. It, therefore, appears that this proposed tramroad or right of way over the lands of plaintiff in error will be surrounded and hemmed in by the private property of the plaintiff in error and the private property of the defendant in error, so that if the right of way be established as prayed by the defendant in error, the public generally, as it would seem, could only use the right of way over the lands of plaintiff in. error, and would be restricted to the use of the right of way on his land—that is, the public, generally, would have no right to use the private road of the defendant in error from the plaintiff in error's land up Dismal creek, a distance of seven miles, to Whitewood, and would have no right to use the tramroad of the defendant in error from Whitewood to Doran on the Norfolk and Western railway.

This court, in *Fallsburg, &c. Co.* v. *Alexander,* 101 Va. 98, 43 S. E. 194, 61 L. R. A. 129, 99 Am. St. Rep. 855, said: "Although not forbidden by the Constitution of this State, the legislature cannot authorize the taking of private property for private use, as it is contrary to the fundamental principles of a republican government."

What is and what is not a public use has been decided in various ways by the States of the Union, but the great weight of authority, both of the decisions and the text-writers, is against any loose construction of the term such as has been given to it in a few of the decided cases.

The statute under which this proceeding is had was taken, it seems, from a statute of the State of Kentucky, which was held constitutional and valid by the court of appeals of that State prior to the passage of the act under consideration, namely, *Chesapeake Stone*

*Co.* v. *Moreland*, 104 S. W. 762, 16 L. R. A. (N. S.) 479, and it is insisted here for the defendant in error, that when a constitutional provision is ordained, or a statute enacted by another State and it is engrafted into the Constitution or statutes of this State, and prior thereto such constitutional provision or statute had received judicial construction by the courts of such other State, then it is to be presumed that the law-making power of this State intended that the constitutional provision or statute should be given the same construction in this State that was given in the State from which it was taken. This principle of construction, however, applies only to the construction of constitutional provisions and statutes, and has no relation, as the authorities hold, to the question of whether or not a statute is constitutional and valid. In other words, the legislature, by enacting a statute which has been held constitutional and valid by the courts of another State, cannot deprive the courts of this State of the right to determine for themselves the question of the constitutionality of such statute.

In *Fallsburg, &c.* v. *Alexander, supra,* a quotation is made from the opinion by Judge Green in the case of *Varner* v. *Martin,* 21 W. Va. 548; "Referring to that class of cases, other than those in which the general public have the immediate use of the property condemned, without charge, as in cases of public highways, where the property condemned is under the control of public officers, though the gratuitous use of it is enjoyed by the public at large, etc., the opinion demonstrates that where the property condemned is in the direct use and occupation of a private person, or of a private corporation, and the general public have only an indirect and qualified use of it, or perhaps no use of it of any kind, or simply derives from its use

some indirect advantage, as by the promotion of the general prosperity of the community to which belong railroads, ferries, grist mills, etc., in order that a person or corporation may be included in this class, and have legislative authority to condemn lands, it must be shown that he or they are possessed of each and all of three qualifications: First, The general public must have a definite and fixed use of the property to be condemned, a use independent of the will of the private person or corporation, in whom the title of property, when condemned, will be vested, a public use which cannot be defeated by such private owner, but which public use continues to be guarded and controlled by the general public through laws passed by the legislature; second, This public use must be clearly a needful one for the public, one which cannot be given up without obvious general loss and inconvenience; third, It must be impossible, or very difficult at least, to secure the same public uses and purposes otherwise than by authorizing the condemnation of private property."

In determining whether the land is sought to be condemned in this proceeding for a public or a private use, it is to be borne in mind that the party asking the condemnation is a lumber company engaged in cutting trees, manufacturing them into lumber and transporting it to market; that it owns timber on various tracts of land on the waters of Dismal creek, a portion of which is below the tract owned by plaintiff in error and its mill, and that it is necessary for the defendant in error to have means of transportation over plaintiff in error's tract of land in order to cut its timber into logs to be carried to its mill for manufacture into lumber, etc., and it is a mere assertion on the part of defendant in error in its petition to the

circuit court that the tramroad it proposes to con-
struct over the land of plaintiff in error would benefit
the public generally; the evidence adduced in the pro-
ceeding being very vague and indefinite as to what
use such tramroad would be to the public generally,
and in fact it refutes the idea that it would be of bene-
fit to the general public.    The act of the General As-
sembly, *supra*, does not pretend to make the defendant
in error a common carrier.    It is not compelled to
carry for the public goods over its tramway, or any
part thereof, but the act merely allows the public to
use the tramway provided the public furnishes its
own rolling stock and power, whether that power be
steam, electricity, mules or gravitation.    Defendant
in error may use, as it would seem, one kind, some of
the public another kind, and the residue of the public
still another kind.    The public, by the terms of the
act, could use the tramway as a public road is used,
but there is no general management to prescribe rules
and regulations for such use, or to provide sidings,
passing points, switches, etc.    Manifestly the tram-
road cannot be operated on the same principles as a
public road.    As to public roads, the legislature can
and does prescribe "the law of the road" as to meeting
and passing, and passing going in the same direction.
So that it is apparent from the whole scope of the act
that it contemplates or makes possible the condemna-
tion of private property for private purposes, in that
it does not provide for a definite and fixed use by the
public of the contemplated tramroad, etc., over the
land authorized by the act to be condemned, whereby
the private benefit too clearly dominates the public
interest to find constitutional authority for the exer-
cise of the power of eminent domain, and is the equiva-
lent of taking private property for a private use,

against the will of the owner, which cannot be done in any case.  The constitutionality of the act is to be determined, not only by what may be attempted to be done in a particular case, but what may be done pursuant to the terms of the act.

Judge Cooley, in his work on Constitutional Limitations, p. 654, says:  "The public use implies a possession, occupation and enjoyment of the land by the public at large, or by public agencies; and the due protection to the rights of private property will preclude the government from seizing it in the hands of the owner and turning it over to another on vague grounds of public benefit to spring from a more profitable use to which the latter may devote it."

As was said in *Brown* v. *Gerald,* (Me.), 100 Me. 351, 61 Atl. 785, 70 L. R. A. 472, 109 Am. St. Rep. 526, the legislature cannot make a private use public by calling it so, so as to justify an exercise of the power of eminent domain in its behalf; the question of its public character must be determined by the court.  "Neither mere public convenience nor mere public welfare will justify the exercise of the right of eminent domain. The mere creation and distribution of power for manufacturing enterprises are not a public use which will justify an exercise of the power of eminent domain. The furnishing of electric power for manufacturing purposes does not become a public use, so as to justify the exercise of the power of eminent domain in its behalf, on the theory that the one generating it may, because of his franchise, be regarded as a public servant; especially since the capacity for service is of necessity limited and cannot extend to the general public, and, therefore, the service is a matter of grace and not of right."

See also *In re Barre Water Co.*, 62 Vt. 27, 20 Atl. 109, 9 L. R. A. 195.

In *Tyler* v. *Baecher*, 44 Vt. 648, 8 Am. Rep. 398, it was held that the legislature did not have the right to declare what was a public use, and that the act under consideration was unconstitutional. That was a case of a grist mill, but an examination of it will show that the Vermont statute was different from the Virginia statute, in that while the owner of the grist mill was required to grind well and sufficiently all grain received, at certain fixed rates of toll, such owner was not compelled to receive grain for grinding against his will. It was held that the public had no right whatever in them, or any other use, and that, therefore, the act allowing condemnation was unconstitutional.

In the case of *Healy Lumber Co.* v. *Morris*, 33 Wash. 490, 74 Pac. 681, 63 L. R. A. 820, 99 Am. St. Rep. 964, it is held:

"(a)   The acquisition of an easement over land for the transportation to market of logs of private owners, is within a constitutional provision that private property shall not be taken for private use and making the question whether or not a contemplated use is private, one for the determination of the courts.

"(b)   That a particular use will be of benefit to the public does not alone make it a public use, within the meaning of a constitutional provision that private property shall be taken only for public use.

"(c)   The constitutional authority to acquire an easement over lands for a private way, of necessity does not empower one land owner to condemn a right of way over his neighbor's property for the purpose of getting his logs and timber to market."

In discussing and disapproving the case of *Dayton* v. *Seawell*, 11 Nev. 394, the Supreme Court of Washington, in the case above cited, says: "There the broad doctrine was announced that an appropriation of private property under the right of eminent domain, for any purpose of great benefit, interest or advantage to the community is a taking for public use; the application in that case being to condemn a strip of land in order to transport the wood, lumber, timbers and other materials to enable it to conduct and carry on its business of mining. The law granting the privilege was sustained, on the ground that mining was one of the leading industries of the State, and the principles above announced were applied. This is, in substance, the contention of the appellant in this case. It seems to us, however, that this is the announcement of a dangerous doctrine tending to encroach upon private rights which the Constitution has attempted to safeguard, and to render such rights as uncertain and varying as are the interests of different localities and opinions of different judges on different branches of business. Under such a rule an act might be construed to be legal one year, because a certain business was found to be profitable to the community at large, and the next year held void, because it appeared that the business was not a paying one.

"The Constitution is the fundamental law. Its enactments, whether they constitute grants or limitations, are presumed to be stable and uniform, and to constitute a check on the more mutable sentiment and actions of members of different legislatures. It seems to us that the result of such construction would be a virtual removal of any constitutional inhibition on legislative power in this respect, leaving the legislative will as free and untrammeled as in those States where

the legislatures are permitted to act in consonance with the inherent power of sovereignty, and no constitutional enactments have intervened. It was no doubt for the purpose of preventing enthusiastic legislation, practically destroying this limitation, that the question of public use was especially submitted to the courts, who are and should be ever watchful in maintaining inviolate the constitutional rights of the citizen."

The same court cites with approval the case of *Bloodgood* v. *Mohawk, &c.,* 18 Wend. 9, 31 Am. Dec. 313, and quotes from it as follows: "When we depart from the natural import of the term 'public use' and substitute for the simple idea of a public possession and occupation, that of public utility, public interest, common benefit, general advantage or convenience, or that still more indefinite term 'public improvement' is there any limitation which can be set to the exertion of legislative will in the appropriation of private property? The moment the mode of its use is disregarded and we permit ourselves to be governed by speculations, upon the benefits that may result to localities from the use which a man or set of men propose to make of the property of another, that moment we are afloat without any certain principle to guide us."

And further in its opinion the court says: "Mr. Cooley in his Constitutional Limitations and Mr. Elliott in his work on Eminent Domain have given this subject special attention, and review all the authorities bearing thereon; and while detached expressions from these authorities frequently made with reference to cases cited, seem to sustain both contentions, yet the general deduction made is opposed to the idea that public use and public benefit are synonymous terms.

"Mr. Lewis, in discussing this identical proposition in section 165, after giving a history of the earlier decisions, concludes as follows:  'Public use means the same as use by the public, and this, it seems to us, is the construction the words should receive in the constitutional provision in question.  The reasons which incline us to this view are:

" 'First, That it accords with the primary and more commonly understood meaning of the words; second, It accords with the general practice in regard to taking private property for public use, in vogue when the phrase was first brought into use in the earlier Constitutions; third, It is the only view which gives the words any force as a limitation, or renders them capable of any definite and practical application. If the Constitution means that private property can be taken only for use by the public, it affords a definite guide to both the legislature and the courts.' "

See also *State of Washington, &c.* v. *White River Power Co.*, 39 Wash. 648, 82 Pac. 150, 2 L. R. A. (N. S.) 842, 4 Ann. Cas. 987.

In the case of *Bridal Veil Lumbering Co.* v. *Johnson*, 30 Or. 205, 46 Pac. 790, 34 L. R. A. 368, 60 Am. St. Rep. 818, the court held that the findings of fact clearly show that the plaintiff is a corporation organized for the construction of a railroad for the transportation of freight and passengers, and is, therefore, a public service corporation; and the court says that the findings being as stated it has no alternative but to affirm the judgment, but adds: "In doing so, however, we do not desire to be understood as holding that a railroad constructed by a mill company for the evident purpose of transporting logs to its mill can become a public highway, so as to justify the exercise of the power of eminent domain in its behalf, because

of any declaration in its articles of incorporation to that effect or on account of any right of the public to use it for the transportation of freight and passengers."

Adverting again to the case of *Varner* v. *Martin*, *supra*, quoted from and approved by this court in the case of *Fallsburg, &c.* v. *Alexander*, in which there is a learned discussion of the mill acts of Virginia, tracing them back prior to the year 1700, it is shown conclusively that the right of condemnation existed in mill cases only for grist mills, and because grist mills were so regulated by statute that the public had a direct interest therein. Grain was not only to be ground for a toll fixed by law, but all grain presented to the miller was to be ground in its turn, and the mill, if destroyed by fire or otherwise, must be reconstructed within a specified time or the land condemned reverted to the original owner. It is shown in the opinion that the rights of the public in all such cases were safeguarded by strict laws imposing penalties and forfeitures for their non-observance, but this was not true of sawmills or other manufacturing plants, and Green, J., in his opinion says: "No effort was ever made, so far as the reported cases show, to condemn lands for mills other than grist mills."

In *Cozad* v. *Kanawha, &c.*, 139 N. C. 283, 51 S. E. 932, 1 L. R. A. (N. S.) 969, 111 Am. St. Rep. 779, Judge Connor, in delivering the opinion of the court, quoted extensively from the argument of counsel, which was strikingly like the argument advanced in *Healy* v. *Morris*, *supra*, and is very similar to the petition filed in the case we have under consideration; and held the act invoked to be unconstitutional. The opinion concludes as follows: "While, as found by his honor, it is reasonable, and even necessary, to the successful operation of defendant's enterprise that

they carry timber and timber products over plaintiff's lands to reach the markets, and while there may be no injustice to him in permitting them to do so, and while his opposition may be either sentimental or selfish, yet the courts will not violate or weaken a fundamental principle, upon the strict observance and enforcement of which the security of all private property, so necessary to the safety of the citizen, is dependent. The guarantees upon which the security of private property is dependent are closely allied and always associated with those securing life and liberty. Where one is invaded, the security of the others is weakened."

Prior to the adoption of our present Constitution, the legislature of Virginia had the power to incorporate public service and public utility corporations, and to grant to them in a proper case the right of eminent domain. Every power could then be conferred upon a corporation at the time of its incorporation that can now be conferred, either by its incorporation by the State Corporation Commission, under the laws now existing, or by laws that may be subsequently enacted by the General Assembly. But, as the learned counsel in this case contend, if the power was not vested in the legislature to declare what is and what is not a public use, before the adoption of the new Constitution, it has certainly not acquired that power since that time, and it cannot do, by means of a general statute, at this time what it could not do before. The same constitutional limitations that hedged it about then control it now, and it can no more confer upon private corporations and individuals the right of eminent domain at this time, under the guise of a public act, than it could grant such right directly to them by private act before the creation of the State

Corporation Commission, and the transfer to it of powers that formerly were held by the legislature.

Section 153 of our present Constitution, in defining terms used in Article 12, says: "The term 'corporation' or 'company' shall include all trusts, associations and joint stock companies having any powers or privileges not possessed by individuals or unlimited partnerships, and exclude all municipal corporations and public institutions owned or controlled by the State; . . . the term 'Transportation company' shall include . . . any freight car company, car association, or car trust, express company, or company, trustee or person in any way engaged in business as a common carrier over a route acquired in whole or in part under the right of eminent domain; . . ." and in subdivision *b* of section 156, the State Corporation Commission is vested with the power and charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses therein by such companies; "and to that end the commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations," etc.

The act here under consideration undertakes to confer upon the circuit courts of this State the control and regulation of tramroads, haulroads and other means of transportation over the lands of another which are authorized to be established by the act in the exercise of the power of eminent domain.

In *Miller* v. *Town of Pulaski*, 109 Va. 137, 63 S. E. 880, 22 L. R. A. (N. S.) 552, an amendment to the

charter of an incorporated town, giving to it the right to condemn property, was held to be unconstitutional, the opinion saying: "An act which authorizes a town to condemn land for the purpose of supplying the inhabitants of said town or other persons, companies or corporations with electric lights or power embraces an object which is constitutional with one which is unconstitutional, and they are so united as to be inseparable, and hence the whole grant of power is unconstitutional. The right to furnish lights or power 'to other persons, companies or corporations,' is a private use, and where the private use is so combined with a public use that the two cannot be separated, the whole act is void." This case also held that whether a particular use is public or not is a question for the judiciary and not for the legislature.

In the still later case of *Norfolk County Water Co.* v. *Wood*, 116 Va. 142, 81 S. E. 19, it appeared that the Norfolk County Water Company was first incorporated by the Circuit Court of Norfolk county in June, 1899, but in January, 1900, an act was passed by the General Assembly ratifying and confirming this charter, and adding thereto the right to condemn such lands as might be necessary for the building of its works, etc., and it was argued that the water company had never done anything but a public service, had never used its water supply for its own or any other private purposes, but devoted the whole to the use of the public generally, but this court held that this did not constitute that company a public service corporation, and that "the status of a company as a public service corporation with the power of eminent domain must be determined, not by what it actually does or intends to do, but what its charter prescribes it must do by way of public duty." It was also held that

"because the legislature has assumed to grant the right of eminent domain, and the grant has been accepted, it does not follow that the grantee is a public service corporation.    The legislature cannot make its use public by declaring it to be such.    The question at law is whether the declared uses are in law public uses, and that is a question which the court must determine."

It was further held in that case that "Before a company can exercise the power of eminent domain, the general public must have a definite and fixed use of the property to be condemned, a use independent of the private person or private corporation in whom the title of the property, when condemned, will be vested— a public use which cannot be defeated by such private owner, but which public use continues to be guarded and controlled by the general public through laws passed by the legislatures.    The general public must have the right to a certain definite use of the private property on terms and for purposes fixed by law, and the owner of the property must be compelled to permit the general public to enjoy it.    The public must have a legal right to the use of the property which cannot be gainsaid, denied or withdrawn by the owner."

We could not in an opinion within reasonable limits undertake to review the numerous cases that have been cited on behalf of the contentions of the defendant in error.    Suffice it to say that our examination of them leads to the conclusion that they are easily to be differentiated or distinguished from the case at bar, or, in fact, have no application to it.    Certainly there is not enough in these cases to warrant us in departing from or qualifying in the least degree the principles of law laid down in our own decisions to which we have referred.    As we have seen, our own decisions are to the effect that before a private corporation, operating

its own sawmill and tramroad, can be given the right
to exercise the power of eminent domain, it must
appear to the court clothed with authority to confer
the power that the use by the general public of the
property to be condemned is definitely fixed, and its
use cannot be defeated by such private owner, nor the
right of the public to the use of the property be with-
drawn, denied or gainsaid.

In the case in judgment the public has no fixed
right which will attach to the property if it is condemned,
and we see nothing in the act to prevent such right
as they have, if any, from being withdrawn at any
time the defendant in error wishes to tear up its track
and remove the same from the tramroad it proposes
to construct over plaintiff in error's land. Upon the
very face of the petition to the circuit court for power
and authority to condemn the land needed by the
petitioner for its proposed tramroad, nothing more
than a temporary easement is sought. When the
timber in the neighborhood is cut and removed, the
tramroad may be abandoned, and the public will have
no redress. The statute does not pretend to give any
relief to the public in any of these matters. There is
no way under the statute by which defendant in error
can be compelled to file a schedule of passenger and
freight rates, nor by which it can be made to operate a
tramroad one day after it sees fit to abandon it, nor
can its operation be regulated and controlled even
while the road is in operation. It cannot be compelled
to run any certain number of trains, either passenger
or freight; it cannot be compelled to operate the road
every day or every week, nor can it be compelled to
operate a train of any sort for any particular distance.
The public is only given the right of travel over the
particular land condemned; it can use only such por-

tions of the road as are condemned, and can use them only as other public roads are used. The right of travel is by section 3 expressly limited as above stated, and being so limited, it is absolutely valueless, and it would, therefore, be absurd to say that any right of travel is conferred upon the public. That section then provides, "that any other person, firm or corporation shall have an equal right to use the said passways, tramroads, haulroads or other means of transportation upon paying compensation therefor;" but it contemplates that a bargain or agreement must be made for each lot of freight that such other person, firm or corporation desires to move over the said roads. If no agreement can be made, then the amount of charge for carrying the freight shall be fixed by the circuit court upon the petition of the person, firm or corporation desiring to use the same, and that upon prepayment of the amount so fixed by the court such person, etc., shall have the right to the use of the said roads as therein provided. No penalties are provided by the act for the failure to perform any duty to the public that would devolve upon the defendant in error. It does not even direct the fixing of a rate by the circuit court, except in each particular instance, and then only after a suit has been duly matured and tried. It is hard to conceive of a more absolutely unworkable and useless right in the public than is contemplated by the act. No provision whatsoever is made for perishable freight, unless the shipper is willing to pay any charges that may be demanded by the owner of the road. The management of the road by the owner may be such as to retard all others than the owner in the use of the road by putting them to great expense, inconvenience and delay. Not only is the carrier not controlled in any way by the act, but the circuit court

which the act seeks to invest with some sort of jurisdiction can have no jurisdiction of this matter.

As it seems to us, the whole scheme for providing a private use in the owner of the tramway together with a public use in the general public is wholly impracticable and in any event would be of no value whatever to the general public, so that after all the sole purpose for which the property of the plaintiff in error would be taken is the exclusive use and benefit of the defendant in error.

Our own decisions which have been cited above are in accord with the great weight of authority. Both the decided cases in other jurisdictions and the text-writers hold that where the property to be condemned is to come under the control of private persons or corporations, three qualifications are necessary to impose upon it such a public use as would justify its being taken, viz.:

1.  The use which the public is to have of the property must be fixed and definite. The general public must have a right to a certain definite use of the private property on terms and for charges fixed by law; and the owner of the property must be compelled by law to permit the general public to enjoy it.

2.  The use of the property by the public must be a substantially beneficial one, which is obviously needed for the public, and which it could not do without, except by suffering great loss or inconvenience.

3.  The necessity for condemnation must be obvious. It must obviously appear from the location of the property or from the character of the use to which it is to be put that the public could not, without great difficulty, obtain the use of this or other land which would answer the same general purpose, unless it be condemned; and in such case the court will judge of

24

the necessity for condemnation. Thus the public use is all-important. There must be an imperious public need. There must be a plain public use in view. The application presented to the court for condemnation is the basis of the proceeding, and it must plainly and affirmatively show the existence of a public need and public use. Because the legislature has assumed to grant the right of eminent domain, and the grant has been accepted, it does not follow that the grantee is a public service corporation. The legislature cannot make a use public by declaring it to be such. The question is whether the declared uses are in law public uses, and that is a question which the courts must determine. Although not forbidden by the Constitution of this State, the legislature cannot authorize the taking of private property for private use, as it is contrary to the fundamental principles of a republican government. A use to the public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owner of the property appropriated to the use. The use of the property cannot be said to be public if it can be gainsaid, denied, or withdrawn by the owner. The public use must dominate the private gain.

In addition to the authorities above cited, see also an elaborate and able note as to the effect of combination of public and private purposes on the right to exercise the power of eminent domain, to a report of the case of *Wisconsin River Improvement Co.* v. *Pier*, 21 L. R. A. (N. S.) p. 538.

For the foregoing reasons we are of opinion that the act—ch. 75 of Acts 1912—*supra*, is unconstitutional and void, and, therefore, the judgment of the circuit

court complained of here will be reversed, and this court will enter the order which the circuit court should have entered, dismissing the petition of defendant in error, with costs to plaintiff in error.

*Reversed.*